**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 17 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ANDRE CURTIS,

    Defendant - Appellant.

No. 02-5047

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 01-CR-03-K)**

Michael G. McGuire, Tulsa, Oklahoma, for Defendant-Appellant.

Kevin Danielson, Assistant United States Attorney (David E. O'Meilia, United States Attorney, Tulsa, Oklahoma, with him on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

Before **EBEL**, **PORFILIO**, and **LUCERO**, Circuit Judges.

**EBEL**, Circuit Judge.

    A jury convicted Defendant-Appellant Andre Curtis ("Defendant") of eight counts of robbery under the Hobbs Act, 18 U.S.C. § 1951, and eight counts of using a gun during a crime of violence, in violation of 18 U.S.C. § 924(c). The

charges stemmed from a string of eight armed robberies that took place in Tulsa, Oklahoma, over a span of ten days in December of 2000. Defendant now appeals his convictions on six grounds: 1) that the court used improperly suggestive and unreliable in-court identification procedures; 2) that his prosecution by the federal government violated his Fifth Amendment due process rights and the separation of powers; 3) that the district court improperly denied his motion to suppress the confession that he gave to police shortly after his arrest; 4) that the district court wrongly refused to suppress security-camera videotapes of four of the robberies; 5) that the district court improperly instructed the jury with respect to the effect that robberies must have on interstate commerce to constitute a violation of the Hobbs Act; and 6) that the Government failed to prove that the robberies sufficiently affected commerce to constitute violations of the Hobbs Act.

We reject each of Defendant's arguments and AFFIRM his convictions on all counts.

## BACKGROUND

On January 11, 2001, a federal grand jury returned a sixteen-count indictment against Defendant Andre Curtis stemming from his alleged participation in eight armed robberies that occurred in Tulsa, Oklahoma, from December 12–21, 2000. Two people charged with assisting Defendant in certain

of those robberies pled guilty; Defendant did not. After a jury trial, Defendant was convicted on all sixteen counts. He was sentenced to 2,271 months in prison.

Following, in chronological order, are the relevant facts surrounding each robbery. As will be discussed in more detail below, the origin of the goods sold by each victimized establishment is relevant for the purpose of establishing the interstate commerce prong of the Hobbs Act violations of which Defendant was convicted.

**Convenient Food Mart, December 12, 2000:** Store clerk Rosalie Hamilton testified at trial that her store was robbed of $100 at gunpoint by a black man with a gap in his front teeth who wore sunglasses. A security camera caught the robbery on tape; that tape was later authenticated by Hamilton and shown to the jury. Store Owner Jack Giffin, who was not present during the robbery, testified that many of his store supplies come from a Texas distributor and that the stolen money would have gone to pay business expenses and purchase items to sell.

**Fresh Kicks, December 12, 2000:** Store owner Melissa Gibson testified that her clothing store was robbed of $600 and some articles of clothing by a black woman and a black man. The black man carried a gun and wore sunglasses, a hooded sweatshirt and a scarf around his mouth and nose. Gibson testified that the stolen clothing was worth several hundred dollars. She also testified that she

had "without a doubt" seen the same man and woman come into her store undisguised ten to fifteen minutes before the robbery, and that the man had a gap in his front teeth. Gibson said she spoke to the man when he came in the first time and that he had "the same type of voice" as the robber. Gibson testified that all of the items in her store came from Texas and Kansas.

**Quik Pick, December 15, 2000:** Store clerk Rashid Qaseem testified that his store was robbed by two people—a black man whose face was covered and who carried a shotgun, and a black man who wore a muffler over his face and carried a hammer. The robber with the gun took approximately $350 from the cash register; the robber with the hammer took Qaseem's cordless phone. The security camera caught the robbery on a videotape that was later authenticated and shown to the jury. Quik Pick obtains its groceries and cigarettes from the Standard Distributing Company of Sapulpa, Oklahoma; Standard's products come from outside Oklahoma. Quik Pick also obtains Coors beer from a distribution company called Eastern Sales; most Eastern Sales products come from outside Oklahoma.

**Super Trip, December 16, 2000:** Store owner Shahrior Yousuf testified that he was robbed of about $65 by a black man with a rifle. A security camera caught the robbery on a videotape that was authenticated and shown to the jury. Most of Super Trip's supplies come from the Standard Distributing Company in

Sapulpa. A Standard representative testified that the products it provides to Super Trip come from businesses located outside Oklahoma.

**Express Mart, December 17, 2000:** Store clerk Gye Hyun Kim testified through an interpreter that her store was robbed at gunpoint of $600–$700 by a black man wearing a mask. The robbery was videotaped, the videotape was authenticated at trial, and parts of it were shown to the jury. Some of Express Mart's products come from Standard Distributing in Sapulpa. A Standard representative testified that the products it provides to Express Mart come from businesses located outside Oklahoma.

**Mohawk Pizza, December 18 & 19, 2000:** Owner Mohammad Shahid testified through an interpreter that his restaurant was robbed at gunpoint two nights in a row. On December 18, he was robbed by a black man with a covered face and a long gun who took about $50 from the store and $25 from a store worker. On December 19, he was robbed by two black men, one of whom carried a small gun; the men took about $15-20. Mohawk Pizza obtains its ingredients from one of two Tulsa stores; one of them, Hodges Quality Meats, obtains its products from Minnesota, Kansas and Missouri.

**Mike's Grocery, December 21, 2000:** Store clerk Zobair Baig testified that his store was robbed of approximately $200-250 by two black men, one of whom covered his face with a scarf or mask and the other of whom covered his

face with the bottom of his shirt. The man wearing the mask had a gun. Mike's Grocery obtains some of its supplies from the Campbell Wholesale Company of Tulsa; a Campbell representative testified that the items it supplied to Mike's came from manufacturers in other states.

**DISCUSSION**

The district court had jurisdiction pursuant to 18 U.S.C. §§ 3231 and 3232. We take jurisdiction pursuant to 28 U.S.C. § 1291.

## I. THE IN-COURT IDENTIFICATION PROCEDURES

Defendant argues that the identification procedures used by the district court at trial were overly suggestive and created a substantial likelihood of misidentification that violated Defendant's due process rights. For the reasons that follow, we reject that argument and find that the identification procedures were appropriate.

After two witnesses testified at trial that they were robbed by a black man with a gap in his teeth, the Government requested that Defendant's gapped teeth be shown to the jury. Defendant could choose either to stand in front of the jury and expose his teeth, or to have a picture taken of his mouth and shown to the jury. After his objection to both options was overruled by the district court,

Defendant chose the former option, to expose his teeth to the jury himself. Before Defendant did so, the court gave a cautionary instruction to the jury, telling it that Defendant's having gapped teeth was "alone... not evidence of anything. Certainly not proof of the commission of any crime, but it might be some corroboration along with other testimony of the two witnesses, Hamilton and Gibson, who claimed to have seen someone that they told you about, seen their front teeth." Defendant then displayed his teeth. He now contends that this procedure violated his due process rights by being unduly suggestive and unreliable, as only two Government witnesses testified about being robbed by someone with gapped teeth.

We review de novo the constitutionality of identification procedures, but we review for clear error the factual basis for the district court's decision. United States v. Kimball, 73 F.3d 269, 272 (10th Cir. 1995). "[W]e examine whether the in-court identification procedure was so suggestive that it denied defendant due process of law. We recognize that if there is a very substantial likelihood of irreparable misidentification under an in-court identification procedure, the district court should take the eyewitness credibility issue from the jury." Id. at 273 (internal quotation marks and citations omitted).

The district court's order that Defendant show his gapped teeth to the jury was reasonable in light of the corroborative testimony by two of the victims.

Rosalie Hamilton of Convenience Food Mart testified that she was robbed by a black man with gapped teeth. The robber wore dark glasses and a sweater with the hood up; Hamilton was unable to state with certainty that the robber was Defendant. Melissa Gibson of Fresh Kicks testified that when Defendant came in her store unmasked, she noticed the gap in his teeth; although the man who robbed her had covered his face, she testified that she was certain it was the same man who had come in earlier, Defendant. Both witnesses stuck to their descriptions on cross-examination. Only after they had testified did the district court order Defendant to display his teeth to the jury, and before the court did so it gave a cautionary instruction to the jury.

In United States v. Robertson, 19 F.3d 1318 (10th Cir. 1994), we upheld a district court's decision to make the defendant don, in front of an eyewitness and the jury, the cap and dark glasses that had been worn by the bank robber in that case. Id. at 1322. We found that such an identification procedure was not unduly suggestive, nor did it create a substantial likelihood of misidentification. Id. at 1323. Therefore, the validity of the identification was properly left to the jury. Id. "'[G]enerally, the question of the suggestiveness or credibility of the in-court identification is to be resolved ultimately by the jury after the defendant has had an opportunity to test the accuracy of an identification through cross-

examination.'" Id. (quoting United States v. Davies, 768 F.2d 893, 904 (7th Cir. 1985)).

In the instant case, Defendant's displaying of his teeth simply allowed the jury to make its own comparison between the description given by the two witnesses and Defendant's actual appearance. We find nothing unduly suggestive about that procedure and conclude that it did not violate Defendant's due process rights.

The second identification procedure about which Defendant complains is his being the only black person in the courtroom for most of the trial. He complains that like the showing of his teeth, the absence of other black people in the courtroom was overly suggestive and created a substantial likelihood of misidentification in violation of his due process rights. We reject this argument as well.

Certainly, identifying the Defendant as the robber, when the robber was a black man and Defendant was the only black man in the courtroom, might be somewhat suggestive, but it is not unconstitutionally so. See United States v. Davis, 103 F.3d 660, 670 (8th Cir. 1996) (rejecting a due process challenge when the defendant was the only black man seated at defense counsel's table, and the only other black man present was seated in the back of the courtroom); cf. Romero v. Tansy, 46 F.3d 1024, 1031–32 (10th Cir. 1995) (rejecting, in a habeas

corpus proceeding, the defendant's argument that an in-court identification procedure was unduly suggestive when the defendant was the only young Hispanic male seated before the bar).  Moreover, "[t]here is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification, such as seating the defendant elsewhere in the room.  These are matters within the discretion of the court."  United States v. Domina, 784 F.2d 1361, 1369 (9th Cir. 1986).

Finally, "where the circumstances of either a pretrial or an at-trial identification are suggestive, reliability is the linchpin for determining admissibility.  Even an identification at trial under circumstances that are tantamount to a showup is not per se inadmissible, but rather depends upon the totality of the circumstances."  United States v. Matthews, 20 F.3d 538, 547 (2d Cir. 1994) (internal quotation marks and citations omitted).  Given the evidence against Defendant in this case—including the videotapes of four of the robberies and Melissa Gibson's testimony that it was "[w]ithout a doubt" Defendant who had robbed her store—we find that the identification of Defendant, despite his presence as the only black man in the courtroom, was sufficiently reliable and not so suggestive as to constitute a due process violation.

## II. THE GOVERNMENT'S DECISION TO PURSUE FEDERAL CHARGES AGAINST DEFENDANT

Defendant argues that the decision to pursue federal rather than state charges against him violated his due process rights because that decision resulted in a higher penalty and was made "with no criteria, in complete confidentiality, as an exercise of absolute executive discretion without so much as a pinprick of due process given the defendant." He also argues that the decision to file federal charges against him violates the separation of powers. Both arguments are plainly without merit.

It is settled law that as long as a prosecutor's charging decision is not based on an impermissible factor such as race, which is not alleged by Defendant in this case, a prosecutor may exercise broad discretion with respect to his charging decisions. As we stated in United States v. Andersen, 940 F.2d 593 (10th Cir. 1991):

> Although a prosecutor obviously cannot base charging decisions on a defendant's race, sex, religion, or exercise of a statutory or constitutional right, see Wayte v. United States, 470 U.S. 598, 608 (1985), "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file . . . generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (footnote omitted).

Id. at 596. Nor is it impermissible for a prosecutor to base his decision on whether harsher penalties are available in federal or state court. Id. It is even permissible for a federal prosecutor to pursue charges against a defendant who

has already been tried and convicted in state court.  Id.  "Applying these principles, we have rejected the argument that a prosecutor's control over charging decisions and plea bargaining practices violates due process."  Id. (citation omitted); see also United States v. Morehead, 959 F.2d 1489, 1499 (10th Cir. 1992), aff'd on reh'g en banc, 971 F.2d 1461 (10th Cir. 1992) ("In the absence of proof that the choice of forum was improperly motivated or based on an impermissible classification as a matter of constitutional law, the prosecutor's discretion to prosecute in a federal rather than a state forum does not violate due process or equal protection notwithstanding the lack of any articulated guidelines for the exercise of such discretion.").  The case law clearly forecloses Defendant's due process challenge to the decision to prosecute him in federal rather than state court, and we reject his challenge accordingly.

Defendant's separation of powers challenge has even less merit.  He argues that a federal prosecutor's unfettered discretion to file federal charges violates the separation of powers because "[t]he number of mandatory consecutive counts filed in an armed robbery prosecution [pursuant to the mandatory consecutive sentencing provision of 18 U.S.C. § 924(c)(1)(D)(ii)] determines with fixed consequences the number of months a defendant faces if found guilty....  A federal judge is of no consequence in adding up the consecutive mandatory counts of 924(c) gun charges."  This argument is plainly without merit, equating as it

does the <u>filing</u> of federal charges against a defendant with the <u>conviction</u> of the defendant on those charges. Regardless of whether the charges are filed in federal or state court, regardless of the comparative severity of the federal penalty, and regardless of the provision mandating consecutive sentences, the prosecution must still prove its case beyond a reasonable doubt. Only if the prosecution succeeds in doing so does the federal judge then step in and sentence the defendant according to 18 U.S.C. § 924(c)(1)(D)(ii). As the Government concisely and correctly points out in its brief to this Court, "The legislative branch wrote the law and set the penalty, the executive branch prosecuted him and he was tried and sentenced by the judicial branch based on the guidelines determined by the Sentencing Commission." Defendant's separation of powers challenge was properly rejected by the district court.

## III. THE DISTRICT COURT'S DENIAL OF DEFENDANT'S MOTION TO SUPPRESS HIS CONFESSION

On the night of his arrest, Defendant was given <u>Miranda</u> warnings and waived those rights. At the Tulsa Police Department, he confessed to the robberies and gave a videotaped and signed, handwritten statement to that effect. He moved to suppress admission of the confession at trial, arguing that when he gave it, he was under the influence of marijuana, crack cocaine and alcohol he

had consumed earlier that day.[1]  After reviewing the videotape and hearing the deposition testimony of the officer who obtained Defendant's confession, testimony from another officer who was with Defendant for an hour and a half before he was interviewed, and testimony from two defense witnesses who stated that Defendant had consumed drugs and alcohol that day, the district court denied the motion to suppress.  It stated:

> I have reviewed the videotape, as I indicated, and there is some slurring, there's some—I think my clerk looked at it also and said something in my bench memo about the defendant looking a little punchy, but there's no indication that his will was overborne.  The testimony from the police officer indicates that there wasn't an obvious problem with the drug use.  I don't see from the videotape an obvious problem.  He's very—I mean, there are times when he lays down and closes his eyes and this and that, but when asked direct questions, he gives answers....  At the very end, when they got to the bottom of the waiver, I think [the detective] points out an area that must be initialed for the discussion to continue, and the defendant appears to think long and hard about that before kind of resignedly initialing that portion....  [H]e appeared to recollect details.  He gave detailed information.  His memory appeared to be good.  His overall intelligence, I just—I didn't see it and I don't think that the evidence is sufficient to indicate an impairment such that the confession was not voluntary and that he was not operating under his own free will.

"In reviewing a district court's denial of a motion to suppress a statement or confession, we accept the district court's underlying factual findings unless they are clearly erroneous.  The ultimate issue of whether a statement was

---

[1]A defense witness who had smoked crack and marijuana with Defendant the day he was arrested testified that they drank and used drugs "from about 3:00 [p.m.] to about nighttime, I'm not sure exactly the exact time."  The police interview with Defendant took place shortly after midnight.

voluntary is a question of law which we review de novo." United States v. Nguyen, 155 F.3d 1219, 1222 (10th Cir. 1998).

"Waiver of one's Fifth Amendment privilege against self-incrimination requires that the individual 'voluntarily, knowingly and intelligently' waive his constitutional privilege." United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). That standard has two prongs:

> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal [sic] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

Id. (quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)) (emphasis added).

On appeal, Defendant bases his challenge to the validity of his confession solely on the fact that he had used drugs and alcohol earlier in the day. He does not allege that he was coerced or not read his rights.

Having reviewed the record, we conclude that Defendant's confession was knowingly and voluntarily given. The officer who arrested Defendant and spent approximately two and a half hours with him at the Tulsa police station testified that Defendant appeared lucid throughout: "[H]e did not appear to be under the influence of any intoxicant. He was very calm and cool and was able to answer

- 15 -

questions." The officer who interrogated Defendant testified that Defendant "was able to conduct a concise conversation, answer questions completely when put to him. Whenever I watched him being brought into the detective's—into the room, he was not stumbling, his speech was not slurred, his eyes somewhat bloodshot, but I could not determine that to be abuse of drugs or to being the lateness of the hour."[2] After hearing this testimony and viewing the videotape of the confession itself,[3] the district court concluded that the evidence did not "indicate an impairment such that the confession was not voluntary and that [Defendant] was not operating under his own free will."[4]

Nothing in the record suggests that the district court's factual findings were clearly erroneous or that its legal conclusion as to the validity of the confession was incorrect. Accordingly, we reject Defendant's challenge to the admission of his confession at trial.

---

[2]The interrogating officer was deposed prior to trial, and his testimony read into the record, because he was in the hospital undergoing treatment for cancer during trial. Defendant raises no objection to the use of the officer's deposition testimony as opposed to his being present at trial.

[3]The videotape was not included in the Record on Appeal.

[4]In its instructions to the jury, the district court said that the jury should decide "whether the statement was knowingly and voluntarily made" and that the jury should decide "what weight, if any," to give the statement.

## IV. THE DISTRICT COURT'S DENIAL OF DEFENDANT'S MOTION TO SUPPRESS VIDEOTAPE EVIDENCE OF THE ROBBERIES

Four of the robberies that Defendant was charged with committing were caught on videotape.[5] Over Defendant's objection, the videotapes were admitted at trial and played for the jury. Defendant challenges the district court's decision to admit the videotapes; he argues that the tapes "were murky, lacked sufficient clarity to identify any of the defendants, and were improperly suggestive when considered by the jury.... These tapes did not help in the identification process except to suggest that the robbers were black, a fact which all the clerks testified to verbatim." As such, Defendant argues, the prejudicial impact of the tapes outweighed their probative value under Federal Rule of Evidence 403.[6]

We review a district court's evidentiary rulings for abuse of discretion. United States v. Kimball, 73 F.3d 269, 271 (10th Cir. 1995).

Defendant's argument lacks merit. "As has been stated many times, Rule 403 does not protect a party from all prejudice, only unfair prejudice." Deters v. Equifax Credit Info. Servs., 202 F.3d 1262, 1274 (10th Cir. 2000) (upholding the district court's decision to admit a videotape that showed defendant in a sexual

---

[5]These videotapes were not included in the Record on Appeal.

[6]Federal Rule of Evidence 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

harassment suit had prior knowledge of workplace harassment similar in type and close in time to the harassment alleged by plaintiff). "Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case. Rather, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991) (quoting Fed. R. Evid. 403 advisory committee's note) (citations omitted); see also, e.g., United States v. Jones, 275 F.3d 673, 681 (8th Cir. 2001) (upholding the admissibility of a videotape of a drug transaction as direct evidence that defendant was involved in a drug conspiracy).

Although the videotapes certainly may have been damaging to Defendant's case, we conclude that they were not unfairly prejudicial. The Government explained the probative value of the videotapes as follows:

> Three tapes show a masked bandit similar in build to Curtis carrying a rifle and wearing articles of clothing matching those items seized in Curtis' car on the night of his capture. In one of the tapes, one can also see co-defendant Rice carrying a hammer and wearing articles of clothing which were also found in Curtis' car on the night of his capture. The tapes are relevant because they corroborate the testimony of the robbery victims and were not unfairly prejudicial, misleading or confusing to the jury.

We find the Government's argument convincing. Nothing in the record suggests that the potentially prejudicial impact of the videotapes outweighed their

- 18 -

probative value at trial. The district court thus did not abuse its discretion in choosing to admit them.

## V. THE DISTRICT COURT'S JURY INSTRUCTION WITH RESPECT TO THE HOBBS ACT CHARGES

Defendant argues that the instruction given to the jury regarding the robberies' effects on interstate commerce was incorrect as a matter of law. He timely objected to the instruction at trial.

The Hobbs Act proscribes, inter alia, conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion." 18 U.S.C. § 1951(a). The Hobbs Act jury instruction read, in relevant part:

> If the Government proves beyond a reasonable doubt that this business purchased goods or services that came from outside the State of Oklahoma and that, therefore, all or part of the money allegedly surrendered by this business because of the alleged robbery could have been used to obtain such goods or services from outside the State of Oklahoma, then you are instructed that you may find that the Defendant "obstructed, delayed, or affected commerce" as that term is used in these instructions. It is not necessary for the Government to prove that the Defendant actually intended to obstruct, delay, or affect commerce. The Government must prove beyond a reasonable doubt, however, that the Defendant deliberately performed an act, the ordinary and natural consequences of which would be to obstruct, delay or affect commerce, and that commerce was, in fact, obstructed, delayed or affected.

(Emphasis added.) Defendant argues that because the Hobbs Act, 18 U.S.C. § 1951, states that a defendant must "in any way obstruct[], delay[], or affect[]

- 19 -

commerce"—not merely that he "could" have done so—the jury instruction was improper. Although expressing "some sympathy" for this argument, the district court rejected it as foreclosed by Tenth Circuit precedent. The district court was correct to do so.

"We review de novo a timely challenge to a jury instruction to determine whether, considering the instructions as a whole, the jury was misled." United States v. Winchell, 129 F.3d 1093, 1096 (10th Cir. 1997). Reversal is inappropriate unless we harbor substantial doubt that the jury was fairly guided. Id.

We have previously upheld jury instructions almost identical to the one that Defendant challenges here. In United States v. Wiseman, 172 F.3d 1196 (10th Cir. 1999), we upheld an instruction that read:

> If the government proves beyond a reasonable doubt that these businesses purchased goods or services that come from outside the State of New Mexico and that, therefore, <u>all or part of the money allegedly stolen from these businesses because of the alleged robbery *could* have been used to obtain such foods or services from outside the State of New Mexico</u>, then you are instructed that you may find that the defendant "obstructed, delayed or affected commerce" as that term is used in these instructions.... The government must prove beyond a reasonable doubt... that the defendant deliberately performed an act, the ordinary and natural consequences of which would be to obstruct, delay, or affect commerce, <u>and that commerce was, in fact, obstructed, delayed or affected</u>.

Id. at 1215 (emphasis added). The Wiseman court explained that "the instruction was not prejudicial because only a potential effect on commerce is required to

satisfy the interstate commerce element." Id. at 1216 (emphasis added). For that proposition, it cited Nguyen, 155 F.3d at 1228.

The Nguyen court upheld a jury instruction that lacked even the certainty of the "that commerce was, in fact, obstructed..." language. The instruction in that case stated that to convict, the jury must find beyond a reasonable doubt that "as a result of the defendant's actions, interstate commerce, or an item moving in interstate commerce, was actually or potentially delayed, obstructed, or affected in any way or degree." Id. at 1228 (internal quotation marks omitted) (emphasis added). The instruction also stated, "If you find that the defendant intended to take certain actions—that is, he did the acts charged in the indictment in order to obtain property—and you find those actions have either caused, or would probably cause, an effect on interstate commerce, then you may find the requirements of this element have been satisfied." Id. (internal quotation marks omitted) (emphasis added); see also United States v. Atcheson, 94 F.3d 1237, 1244 (9th Cir. 1996) (upholding a jury instruction which stated that to establish a Hobbs Act violation, the Government need prove only that the Defendant's acts had a probable or potential effect on interstate commerce). But see United States v. Williams, 308 F.3d 833, 837–38 (8th Cir. 2002) (invalidating but holding harmless error an instruction which stated that a Hobbs Act violation's "effect on interstate commerce may be merely probable or potential, not an actual effect").

In the next section, we address the aggregation/"depletion of assets" theory on which the Nguyen court relied in upholding the jury instruction in that case. For the purposes of Defendant's challenge to the jury instruction, however, we need not address that theory here. It is enough to note that because we have previously upheld jury instructions almost identical to the instruction given in Defendant's case, his challenge to that instruction must fail. See United States v. Edward J., 224 F.3d 1216, 1220 (10th Cir. 2000) ("Under the doctrine of stare decisis, this panel cannot overturn the decision of another panel of this court barring en banc reconsideration, a superseding contrary Supreme Court decision, or authorization of all currently active judges on the court.") (internal quotation marks and citation omitted).

## VI. THE SUFFICIENCY OF THE EVIDENCE REGARDING THE HOBBS ACT CHARGES

Defendant challenges his eight Hobbs Act convictions on the ground that the evidence introduced at trial was insufficient to prove that the robberies "in any way or degree obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce, by robbery or extortion," as required by the Hobbs Act, 18 U.S.C. § 1951(a). While we acknowledge that

some of the amounts stolen in these robberies were quite small,[7] the clear dictates of Tenth Circuit precedent lead us to reject Defendant's argument.

"We review the sufficiency of the evidence de novo, viewing the evidence and the inferences therefrom in a light most favorable to the government to determine if a reasonable jury could find beyond a reasonable doubt that the defendant was guilty." Nguyen, 155 F.3d at 1223.

The plain language of the Hobbs Act does not require that a robbery have a substantial effect on interstate commerce. The statute reaches robberies that "in any way or degree obstruct[], delay[], or affect[] commerce." Id. (emphasis added). The Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." Stirone v. United States, 361 U.S. 212, 215 (1960). We have repeatedly interpreted the "broad language" of the Hobbs Act to mean that for the Government to obtain a conviction under the Act, the evidence need show only a potential or de minimis effect on interstate commerce. Simply proving that a robbery depleted the assets of a business engaged in interstate commerce will suffice. See, e.g., United States v. Battle,

---

[7]The following amounts were stolen in the eight robberies: $100 (Convenience Food Mart); $600 (Fresh Kicks); $350 (Quik Pick); $65 (Super Trip); $600-700 (Express Mart); $50 (Mohawk Pizza) and $25 (from a Mohawk worker personally); $15-20 (Mohawk Pizza); and $200-250 (Mike's Grocery). The amounts stolen thus range from $15 to $700.

289 F.3d 661, 663 (10th Cir. 2002) ("[T]he Hobbs Act is violated even if the robbery of a convenience store does not have a substantial effect on interstate commerce.") (affirming the conviction of a defendant who stole approximately $320 from a convenience store and killed its owner); United States v. Morris, 247 F.3d 1080, 1087 (10th Cir. 2001) ("[W]e have repeatedly held that the government need only show a de minimis effect on interstate commerce to prove a Hobbs Act violation... because the Act has a jurisdictional element, which ensures that in each case a nexus between the conduct at issue and interstate commerce exists.") (affirming the Hobbs Act convictions of a defendant who robbed unspecified amounts from two grocery stores and a Burger King); Wiseman, 172 F.3d at 1216 ("[O]nly a potential effect on commerce is required to satisfy the interstate commerce element.") (upholding six Hobbs Act robbery convictions in which the defendant stole between $2,500 and $20,000 during each robbery); Nguyen, 155 F.3d at 1224 ("The minimal effect on commerce may be established by evidence that the assets of a business engaged in interstate commerce, or which customarily purchases items in interstate commerce, are depleted.") (upholding a Hobbs Act conviction when defendant's robbery of a restaurant and taking of money from murder victim's purse led restaurant to eventually shut down); United States v. Zeigler, 19 F.3d 486, 489 (10th Cir. 1994) ("In accordance with the plain language of the statute, this court has held that the

jurisdictional predicate of the Hobbs Act can be satisfied by a showing of any de minimis effect on commerce.") (affirming a defendant's six convictions for robberies ranging in amount from $160 to $1,500 and suggesting that even theft of $100 could satisfy the Act) (internal quotation marks and citations omitted).

The aggregation/depletion-of-assets theory is based on the Supreme Court's decision in Wickard v. Filburn, 317 U.S. 111 (1942). In Wickard, the Court upheld Congress's power under the Commerce Clause to regulate a farmer's production of wheat that was purely for home use. The Court reasoned that because the consumption of home-grown wheat would reduce an individual's demand for wheat from the broader marketplace, the cumulative effect of such home consumption could have a substantial effect on the interstate wheat market. Id. at 127–28. Therefore, such consumption was subject to congressional regulation under the Commerce Clause. As we explained in Nguyen,

> Under an aggregate or cumulative analysis, and in the context of the instructions as a whole, the words probable and potential [in the Hobbs Act jury instructions] indicate to the jury that, like the wheat in Wickard, the government is not required to show that the particular stolen dollars themselves would have entered the stream of interstate commerce. Instead, the government must show only that the stolen dollars depleted the total assets of the restaurant which were available to engage in interstate commerce.

155 F.3d at 1228.

After hearing the Government's evidence, the jury found that each of the victimized businesses received some or all of their inventory from businesses

- 25 -

outside Oklahoma or, somewhat more indirectly, from businesses in Oklahoma that received their goods from out of state. We have previously found a sufficient interstate commerce nexus on both such direct and indirect links. See Zeigler, 19 F.3d at 491 ("The evidence is uncontroverted that all six victimized businesses were engaged in interstate commerce. Each of the businesses except Lucky Stop purchased the majority of its products directly from out-of-state suppliers. Lucky Stop purchased goods from an Oklahoma distributor who in turn purchased the goods it supplied to Lucky Stop from outside the state. This indirect link to interstate commerce is sufficient to establish that Lucky Stop was engaged in interstate commerce."); see also United States v. Elias, 285 F.3d 183, 189 (2d Cir. 2002) ("In short, a robbery of a local distribution or retail enterprise may be said to affect interstate commerce if the robbery impairs the ability of the local enterprise to acquire—whether from out-of-state or in-state suppliers—goods originating out-of-state.") (citing United States v. Mapp, 170 F.3d 328, 336 n.13 (2d Cir. 1999)); United States v. Brown, 959 F.2d 63, 68 (6th Cir. 1992) ("Brown attempted to rob a tavern that... purchased goods from local distributors who in turn purchased goods from outside of the state. Had Brown's heist been successful, there is a realistic probability that the depletion of the bar's assets would have affected the amount of its purchases of beer having moved through interstate commerce. Under our prior decisions, the prosecution clearly met its

burden of showing the necessary nexus between the attempt robbery and interstate commerce to support Brown's conviction.") (emphasis added).

In sum, we find that the evidence introduced by the Government at trial was sufficient to sustain Defendant's convictions under the Hobbs Act. Accordingly, we reject Defendant's challenge to his convictions on this ground.

## CONCLUSION

For the foregoing reasons, we AFFIRM Defendant's convictions and sentence on all counts.