DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of conviction and sentence entered by the Lucas County Court of Common Pleas, after a jury found appellant, Raymond T. Lininger, guilty of two counts of aggravated robbery with firearm specifications, two counts of kidnapping with firearm specifications, and one count of negligent assault.
 {¶ 2} On June 11, 2004, Lininger was indicted and charged with two counts of aggravated robbery with firearm specifications in violation of R.C. 2911.01(A)(1), both first degree felonies; two counts of kidnapping with firearm specifications in violation of R.C. 2905.01(A)(2), both first degree felonies; two counts of robbery in violation of R.C. 2911.02(A)(2), both second degree felonies; and one count of felonious assault in violation of R.C.2903.11(A)(2), a second degree felony. The incidents leading up to the indictment occurred only eight days apart, on May 22 and 30, 2004. On May 31, 2005, the case proceeded to trial at which the following evidence was presented.
 {¶ 3} Gail Kaminski testified that shortly after 11:00 p.m. on May 22, 2004, she drove to Delaney's, a bar off of Alexis Road in Toledo, Ohio. While in the parking lot of Delaney's, Kaminski was approached by a man, she later identified as Lininger, who asked for directions to "L'il Sheba's." She testified that after giving Lininger directions, she entered Delaney's but then returned to her car to get her ID. While opening her car door, Kaminski was confronted by Lininger, who put a gun in her back and said "Get in the car now, bitch, or I'll blow your head off." Kaminski testified that she was forced to slide from the driver's side of the car to the passenger side. Then, while driving Kaminski's car, Lininger asked her to give him all the money she had.
 {¶ 4} Kaminski testified that while she was in the car with Lininger, he drove with one hand and used his other hand to hold his gun against her hip. When she told Lininger she only had $15, he drove her to an ATM and backed up to the ATM, so that Kaminski could access it from the passenger side. Kaminski further testified that Lininger said "You do anything funny, anything, I swear to God to you, I'll blow a hole in your back and then I'll kill myself, because I ain't going to jail."
 {¶ 5} After showing Lininger that she did not have any money in the bank, Kaminski offered to give him her checkbook. Kaminski testified that Lininger then drove her to a party store on Alexis Road to have her write a check. Lininger followed her into the party store after again threatening to "blow a hole" in her and to kill himself if she did anything or said anything wrong. While in the party store Lininger stood directly behind Kaminski. Kaminski testified that the party store would not cash her check, so they returned to her car.
 {¶ 6} Kaminski testified that Lininger then drove her to a Kroger's store on Laskey Road. She stated that Lininger accompanied her into the Kroger's after again threatening to shoot her and himself if she did anything wrong. Kaminski purchased cigarettes and batteries for Lininger and then asked if she could write a check for an amount over the purchase. Kroger's, however, would not allow her to write a check over the purchase amount because it was after 11:00 p.m.
 {¶ 7} Kaminski testified that after returning to her car, Lininger drove to Rico's, a bar on Alexis Road. Kaminski stated that before entering Rico's, Lininger once again threatened to shoot her and himself if she did anything wrong. While in the bar, Lininger ordered two drinks, but when the waitress would not accept a check from Kaminski, Lininger grabbed Kaminski by the arm and left the bar.
 {¶ 8} Katherine Dyer, a waitress at Rico's, testified that a couple came in to the bar on May 22, 2004, and asked to cash a check after ordering two drinks. Dyer was unable to describe the female in the couple, but she described the male in the couple as being white, with a medium build, scruffy, and with long hair.
 {¶ 9} Kaminski testified that after leaving the bar, she told Lininger that she had a friend at Raceway Park on Telegraph and Alexis Roads. Lininger then drove them to Raceway Park and again threatened Kaminski before entering the track. Kaminski testified that before entering Raceway Park, Lininger promised to let her go if she got him $50. Once inside, Lininger stood a bit farther away from Kaminski while Kaminski approached her friend, Paola Pino, who was working at the time. Kaminski testified that she told Pino "give me fifty dollars now. See that guy back there? If you do not give me fifty dollars I'm going to die." Pino gave Kaminski the $50 and Kaminski and Lininger left.
 {¶ 10} Paolo Pino testified that Kaminski had come into Raceway park on the evening of May 22, 2004, and said "Give me fifty dollars right now or I am about to die." Pino testified that there was a man there with Kaminski, who she described as a white man, scruffy, with long hair.
 {¶ 11} Kaminski testified that after leaving Raceway Park she convinced Lininger that she did not tell on him or say anything while getting the $50. Kaminski stated that Lininger drove her to a neighborhood by Delaney's, stopped in the street, and told her to get out of the car. Kaminski then testified that Lininger got out of the car and told her to walk away and not to look back. Once Lininger was gone, Kaminski got back into her car, drove back to Raceway Park, and called the police.
 {¶ 12} After the incident, Kaminski described Lininger to the police as a "Skinny guy, bad teeth, really bad teeth, pony tail, sweat shirt, jeans." Kaminski testified that about a week later she met with Detective Permar and picked Lininger out of a photo lineup. Kaminski also identified Lininger in court.
 {¶ 13} The facts regarding the May 30, 2004 incident were testified to as follows:
 {¶ 14} On the evening of May 30, 2004, Cassandra Wheeler was at the Kroger's grocery store on Lewis and Alexis Roads purchasing cake and ice cream. Wheeler testified that after loading the groceries into her silver Nissan Sentra she was about to leave the parking lot when a man who she subsequently identified as Lininger tapped on her driver's side window. Wheeler stated that Lininger pointed to her front driver side wheel and said "You have a flat tire." Wheeler testified that she exited her car to investigate, but after seeing that her tire was not flat she noticed that Lininger had a gun out and pointed at her. Wheeler stated that Lininger said something to the effect of "yeah, I have a gun, get in the car." Wheeler testified that she only saw the front part of the barrel, but Lininger did something to the gun to make it click.
 {¶ 15} Wheeler testified that she entered her car through the driver's side door and climbed over the center console to the front passenger's side seat. Wheeler testified that Lininger said something to the effect of "Yes, I've got a gun." Lininger then drove Wheeler to a Fifth/Third Bank on the corner of Lewis and Alexis Roads, where he backed up to the ATM. Wheeler testified that Lininger drove with one hand and held a gun pointed at her side with the other. Wheeler stated that Lininger instructed her to use the ATM to pull out as much money as she could. After many tries, however, Wheeler could not get the ATM machine to accept her card. Wheeler stated that as she kept trying to use the ATM unsuccessfully, Lininger grew more frustrated.
 {¶ 16} Wheeler testified that Lininger left the bank and drove west on Alexis towards Secor Road. Wheeler stated that she attempted to reach her cell phone in the back seat to call an emergency number, but Lininger noticed what she was doing and took her cell phone away. Wheeler stated that she then tried to talk Lininger into letting her call her father to get him some money, but Lininger refused. Wheeler testified that she felt a need to "get away any way" she could.
 {¶ 17} Lininger then turned into a neighborhood and headed north. Wheeler stated that she then noticed that Lininger did not have his gun in his hand any longer. Rather, he was holding the wheel and gearshift. Wheeler testified that as the car approached an intersection, she decided to jump out the passenger door. Wheeler stated that as she jumped from the car, Lininger accelerated and somehow she was dragged by the car along the street curb. Wheeler testified that she was eventually free of the car, but only after the car ran over her legs.
 {¶ 18} Michael Henry testified that on May 30, 2004, while driving north on Secor Road, he saw Wheeler's car jump forward, go up over the curb, and then drive away. When Henry turned onto Glenn Road, the street that he saw the car speed off from, he saw Wheeler laying in the road screaming. Henry stated that the events he saw occurred around 9:00 or 9:10 p.m. Henry testified that when he approached Wheeler, she was screaming and said "He's got a gun. He stole my car." Henry also stated that he noticed a tire track on Wheeler's ankle all the way up to her hip. Henry stated that all he remembered was the Nissan, Wheeler's car, take off north on Secor Road, though he could not identify the driver of the car.
 {¶ 19} Irma Oberneder, a police officer called to the scene of where Wheeler jumped from the car, testified that she interviewed Wheeler after the incident. Oberneder's testimony corroborates Wheeler's testimony as to the events that took place on May 30, 2004. Oberneder testified that Wheeler described the assailant as a white male, 47 to 52 years old, with brown curly collar length hair, messed up teeth, between five feet eight inches and five feet ten inches tall, and weighing between 140 to 150 lbs. Oberneder also testified that Wheeler stated that, aside from her Nissan, she was missing her cellular phone, a Capital One credit card, and a key chain.
 {¶ 20} After the incident, Wheeler described the assailant to the police as having a pony tail, wearing a hat and a windbreaker, and having "messed up teeth." Wheeler testified that after the incident she met with Detective Tetuan and was asked to identify Lininger from a photo lineup. Wheeler was able to narrow her identification of the assailant down to two photographs, one of which was Lininger. Wheeler admitted that it was not until after she saw Lininger on television that she was positive that she could identify him. Wheeler identified Lininger in court during the trial as the man who abducted her.
 {¶ 21} After Wheeler identified Lininger in court, the prosecution had Lininger display his teeth to the jury over Lininger's objection. The court allowed this, as it addressed an identification question in witness testimony.
 {¶ 22} Paul Tetuan, a detective working for the special victims unit of the Toledo Police Department, testified that he interviewed Wheeler at the site where Wheeler jumped from her car and at a later date. Tetuan stated that at the accident site Wheeler described Lininger as having messy teeth. Wheeler also described Lininger's height, weight, clothing, and hair.
 {¶ 23} Tetuan testified that through a lead generated by the Crime Stopper program, he developed a possible suspect in Wheeler's case. Tetuan stated that he met with Wheeler two days after the incident and showed her a photo array. Tetuan testified that Wheeler was able to narrow the photo array down to two persons, but Wheeler was unable to select which of the two persons was her assailant. Under cross-examination Tetuan stated that out of the two person in the photo array, Wheeler indicated that she thought that it was more likely that the other person, not Lininger, was her assailant.
 {¶ 24} Jeffrey Dorner, a police officer in the Toledo Police Department, testified that on June 2, 2004, he responded to a report of a suspicious automobile on the 200 block of Linden. Upon investigation, Dorner discovered that the Nissan was reported stolen and that detectives told him it had been used in a kidnapping. He further stated that the stolen Nissan belonged to Wheeler. Tetuan testified that no finger prints were found in Wheeler's car.
 {¶ 25} William Seymour, a detective for the Toledo Police Department, testified that on June 3, 2004, he aided Detective Permar in executing a search warrant of Lininger's apartment at 740 West Alexis Road in Toledo, Ohio. Seymour stated that Lininger was present at the apartment as it was being searched. Seymour stated that he and other officers were searching for "any weapon, such as a gun, or any, perhaps, property belonging to any of the two females, the victims in this cases." Seymour testified that neither a gun nor any property belonging to Wheeler or Kaminski was recovered from Lininger's apartment.
 {¶ 26} Seymour testified that he interviewed Lininger at the police station after the search of his residence. During that interview, Lininger indicated that he was familiar with the places where the kidnappings initially occurred, and that four or five days earlier, he had been in the Kroger's parking lot, where Wheeler was kidnapped, to collect cigarette butts. Seymour testified that Lininger denied any involvement in the offenses for which he was arrested.
 {¶ 27} Following the trial, on June 2, 2005, the jury found Lininger guilty of two counts of aggravated robbery, two counts of kidnapping, and one count of negligent assault. The sentencing hearing was held on June 8, 2005. At that hearing the court first addressed the May 22, 2004 incident. The court ordered Lininger to serve four years for one count of aggravated robbery, six years for one count of kidnapping, and three additional mandatory consecutive years for the firearm specification, for a total of 13 years. For the May 30, 2004, incident, the judge again ordered Lininger to serve four years for one count of aggravated robbery, six years for one count of kidnapping, and three additional mandatory consecutive years for the firearm specification, for a total of 13 years. The court further sentenced appellant to 60 days on the negligent assault conviction, and ordered that term to be served concurrently with the other terms. The sentences for the May 22 offenses were ordered to be served consecutive to the sentences for the May 30 offenses for a total sentence of 26 years incarceration.
 {¶ 28} Lininger now appeals his convictions and sentences through the following six assignments of error:
 {¶ 29} "I. Lininger's convictions were not supported by the limited available evidence and, in fact, were against the manifest weight of the evidence.
 {¶ 30} "II. The trial court erred in refusing to allow separate trials of these multiple counts involving two victims and two incidents.
 {¶ 31} "III. The victim's pretrial identification of Lininger was so suggestive that her in court [sic] identification was impermissibly tainted.
 {¶ 32} "IV. The state's closing arguments were improper and constituted misconduct.
 {¶ 33} "V. The manner in which Lininger was forced to display his teeth to the jury was unconstitutional.
 {¶ 34} "VI. The trial court violated Lininger's constitutional rights through the sentence that was imposed."
 {¶ 35} In his first assignment of error, Lininger asserts that there was insufficient evidence to support the verdicts below and that the verdicts were against the manifest weight of the evidence.
 {¶ 36} The Supreme Court of Ohio has ruled that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."State v. Thompkins (1997), 78 Ohio St.3d 380, 386. "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id. Upon review of the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Under a manifest weight standard, however, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Thompkins, supra at 387. The appellate court, "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weights heavily against conviction.'" Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 37} Lininger was convicted of two counts of aggravated robbery with firearm specifications, two counts of kidnapping with firearm specifications, and one count of negligent assault.
 {¶ 38} Aggravated robbery is prescribed by R.C.2911.01(A)(1), in relevant part, as "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, * * * shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"
 {¶ 39} In the case at bar, the testimony established that $15 to $25 was taken from Kaminski in addition to $50 provided by Kaminski's friend. Wheeler's testimony established that Lininger took her cell phone, her key chain, her Capital One credit card, and her automobile. Both Kaminski and Wheeler testified that Lininger possessed and threatened to use a firearm while committing the robberies. The only conflicting testimony was with regard to the Wheeler incident, as police were unable to recover any forensic evidence from the stolen Nissan after it was recovered. Also Seymour testified that no stolen property was recovered from Lininger's apartment.
 {¶ 40} Kidnapping is prescribed under R.C. 2905.01(A)(2), in relevant part, as: "(A) No person, by force, threat, or deception, * * * by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * (2) To facilitate the commission of any felony * * *[.]"
 {¶ 41} Both Kaminski and Wheeler testified that Lininger threatened them with a gun, forced them into the passenger seat of their automobiles and took them to an ATM. Kaminski testified that she was also taken by Lininger to area businesses and to Raceway Park. Kaminski's and Wheeler's testimony show that this was done for the purpose of facilitating a felony, namely aggravated robbery.
 {¶ 42} Both counts of aggravated robbery and kidnapping have firearm specifications attached to them pursuant to R.C.2941.145(A): " Imposition of a three-year mandatory prison term upon an offender under division (D)(1)(a) of section 2929.14 of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."
 {¶ 43} Kaminski and Wheeler testified that Lininger possessed a firearm and threatened them with it during the commission if the aggravated robbery and kidnapping. The only contrary testimony is that no handgun was found when Lininger's apartment was searched by the police, and that Lininger in his interview stated he did not own a gun.
 {¶ 44} Negligent assault is prescribed by R.C. 2903.14, in relevant part, as "(A) No person shall negligently, by means of a deadly weapon or dangerous ordnance * * *, cause physical harm to another * * *. (B) Whoever violates this section is guilty of negligent assault, a misdemeanor of the third degree."
 {¶ 45} This charge relates to the Wheeler incident. Wheeler testified that when she jumped out of her automobile, Lininger sped up and tried to run her over. Both Wheeler's and Henry's testimony established that Wheeler's legs were run over by Lininger when he swerved up onto the curb after Wheeler jumped out of the automobile. The deadly weapon or ordnance in this count was the automobile itself. There was no testimony to the contrary, other than the fact that Henry could not identify the driver of the automobile.
 {¶ 46} The evidence presented at trial supported the jury's verdicts and convictions of Lininger as to all five charges and specifications. Given this evidence, we cannot say that the verdicts were unsupported by the evidence or were against the manifest weight of the evidence. Lininger's first assignment of error is not well-taken.
 {¶ 47} In his second assignment of error, Lininger asserts that the trial court erred in refusing to sever the charges involving the two victims, and that he was prejudiced by the court's trying of the offenses together.
 {¶ 48} Crim.R. 8(A) provides that "[t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, * * * are of the same or similar character * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."
 {¶ 49} Under the Ohio Rules of Criminal Procedure the joinder of the offenses stemming from the two incidents into one trial was permissible. The evidence from both incidents was of the same or similar character. Both were crimes against women involving kidnapping and aggravated robbery, and both incidents shared a common or similar scheme or plan.
 {¶ 50} It is well-settled that "[a] defendant claiming error in the trial court's refusal to allow separate trials of multiple charges has the burden of affirmatively showing that his rights were prejudiced * * * [and] that the trial court abused its discretion in refusing to separate the charges for trial." Statev. Torres (1981), 66 Ohio St.2d 340, 343. See, also, State v.Coley (2001), 93 Ohio St.3d 253.
 {¶ 51} Lininger claims that the joinder was prejudicial because the evidence pertaining to the identification of Lininger in the May 30, 2004 incident was weak when considered separate from the May 22, 2004 incident.
 {¶ 52} A trial court will not be found to have abused its discretion unless the decision involves more than an error of judgment or law and can be characterized as unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 53} The court in Torres, supra at 343, stated: "[j]oinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak." The offenses involved in the two incidents herein were not only related, but were very similar in nature. Lininger states in his brief that the evidence to the Wheeler incident was very weak, and the evidence from the Kaminski case benefited the Wheeler case. While the Wheeler case may have had "weaker" evidence, the rules of criminal procedure allow the joinder of the charges into one trial.
 {¶ 54} "A prosecutor can use two methods to negate such claims of prejudice." State v. Lott (1990), 51 Ohio St.3d 160,163. "First, if one offense would have been admissible under Evid. R. 404(B), no prejudice could have resulted from joinder. `To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question.'" Coley, supra at 259-260, quoting State v. Lowe (1994), 69 Ohio St.3d 527, paragraph one of the syllabus. Under the second method, "the state can separately negate prejudice by showing that `evidence of each crime joined at trial is simple and direct. * * * Thus, when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of' whether the evidence is admissible as other-acts evidence." Coley, supra at 260, quoting Lott,
supra at 163.
 {¶ 55} Under the first method, the evidence from both incidents would have been admissible in the individual trials of the incidents under Evid. R. 404(B), which states in relevant part "[e]vidence of the other crimes, wrongs, or acts * * * may * * * be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Thus the evidence from the Kaminski incident would have been admissible in the prosecution of the Wheeler incident to prove Lininger's identity or plan. Despite the alleged "weak" evidence of the Wheeler incident, the Kaminski evidence would be admissible if the two incidents were tried separately.
 {¶ 56} Under the second method, the testimony and evidence presented by the prosecution in the present case were separated and parsed out as to each separate incident, thus the likelihood of jury confusion was minimal. Though the charges were almost the same for both incidents, the evidence presented as to each incident was direct and simple.
 {¶ 57} Because Lininger was not prejudiced by the joinder of the offenses, the second assignment of error is not well-taken.
 {¶ 58} In his third assignment of error, Lininger contends that Wheeler's pretrial identification of him was so suggestive that her in-court identification was impermissibly tainted.
 {¶ 59} "Where a witness has been confronted by a suspect before trial, that witness' identification of the suspect will be suppressed if the confrontation procedure was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances." State v.Brown (1988), 38 Ohio St.3d 305, 310, citing Manson v.Brathwaite (1977), 432 U.S. 98.
 {¶ 60} Lininger contends that Wheeler's in-court identification of him was impermissibly tainted because she saw him on TV prior to the trial. Lininger contends that Wheeler was unable to conclusively identify him from a photo lineup, and that she was only able positively to identify him after seeing him on TV a few days later.
 {¶ 61} "The rationale for excluding a tainted pretrial identification is to protect the defendant from misconduct by the state." Brown, supra at 310. In the case at bar, there was no state action. Wheeler's viewing Lininger on TV was not arranged by the state. Hence, Brown and Manson are inapplicable here. "The alleged suggestiveness of the identification, therefore, goes to weight and reliability of the testimony rather than admissibility." Id. at 310-311.
 {¶ 62} Wheeler's failure to identify Lininger from a photo lineup was an issue of credibility, not admissibility. Issues of credibility are for the jury to resolve, not the trial judge. AsBrown and Manson do not apply, the trial court did not err in failing to suppress Wheeler's in-court identification of Lininger. Lininger's third assignment of error is not well taken.
 {¶ 63} In his fourth assignment of error, Lininger states that arguments and remarks made by the state in its closing argument were improper and constituted prejudicial prosecutorial misconduct. In his brief, Lininger cites 12 instances of prosecutorial misconduct.
 {¶ 64} Generally, conduct of a prosecuting attorney at trial shall not be grounds for reversal unless the conduct deprived the defendant of a fair trial. State v. Apanovitch (1987),33 Ohio St.3d 19, 24. An appellant is entitled to a new trial only when a prosecutor asks improper questions or makes improper remarks and those questions or remarks substantially prejudice appellant.State v. Smith (1984), 14 Ohio St.3d 13, 14. In analyzing whether an appellant was deprived of a fair trial, an appellate court must determine whether, absent the improper questions or remarks, the jury would have found the appellant guilty beyond a reasonable doubt. State v. Maurer (1984), 15 Ohio St.3d 239,267. Moreover, the prosecutor's conduct must be considered in the context of the entire trial. State v. Keenan (1993),66 Ohio St.3d 402, 410. The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Smith v. Phillips
(1982), 455 U.S. 209, 291. An accused is guaranteed a fair trial, not a perfect one.
 {¶ 65} Generally, the state may comment freely on "`* * * what the evidence has shown and what reasonable inferences may be drawn therefrom.'" Lott, supra at 165, quoting State v.Stephens (1970), 24 Ohio St.2d 76, 82. Prosecutors, however, may not invade the realm of the jury by rendering their personal beliefs regarding guilt and credibility, or alluding to matters outside of the record. Smith, supra at 14. Moreover, they are not to "allude to matters which will not be supported by admissible evidence, DR 7-106(C)(1), and `* * * [a] lawyer should not make unfair or derogatory personal reference to opposing counsel. * * *' EC 7-37." Id.
 {¶ 66} This court has held that when a defendant has failed to object, review of the alleged improper statements is discretionary and limited to plain error only. State v. Griffin
(Nov. 17, 2000), 6th Dist. No. L-98-1215. While Crim. R. 52(B) provides that plain errors or defects affecting substantial rights may be noticed although they are not brought to the attention of the trial court, notice of plain error must be taken with the utmost caution, under exceptional circumstances, and only in order to prevent a manifest miscarriage of justice. Id.
In order to prevail on a claim governed by the plain error standard, the defendant must demonstrate that the outcome of his trial would clearly have been different but for the errors he alleges. Thus, alleged prosecutorial misconduct constitutes plain error only if it is clear that the defendant would not have been convicted in the absence of the improper comments. In such a case, the plain error standard generally presents an almost insurmountable obstacle to reversal. Id.
 {¶ 67} It is well established that it is improper for a prosecutor to state his or her personal belief that a witness was or was not telling the truth. Smith, supra at 14.
 {¶ 68} Lininger asserts in his brief that the prosecutor in the trial court committed 12 separate instances of prosecutorial misconduct during the closing arguments. Lininger, however, only objected to two of these instances: where the prosecutor stated that certain facts were not in dispute and where the prosecutor allegedly made dismissive comments regarding the lesser included offenses.
 {¶ 69} While both of these instances were objected to by Lininger, neither of the comments substantially prejudiced Lininger. In the first instance, the prosecutor corrected his statements following Lininger's objection. In the second instance, the prosecutor's comments fell within the "degree of latitude" granted to prosecutors. The prosecutor's comments were merely a presentation of the alternative charges against Lininger, were the jury to not accept that Lininger brandished a gun during the two incidents. This court finds that neither comment prejudiced Lininger, and thus there was no prosecutorial misconduct.
 {¶ 70} The other instances of alleged prosecutorial misconduct were not objected to by Lininger at trial. As such, the comments must rise to the level of plain error for this court to find that Lininger was substantially prejudiced and to merit a reversal.
 {¶ 71} In the first instance that was not objected to by Lininger, the prosecutor commented that Lininger's testimony placed him at the scene of the crime. In the second instance, the prosecutor made comments about Lininger having a twin and Kaminski's identification of Lininger. In the third instance, the prosecutor commented on the percentage of verbal testimony compared to forensic evidence. In the fourth and fifth instances, the prosecutor commented that the victim had no motivation to lie and that Kaminski deserved an Oscar award for her testimony if she were lying. In the sixth instance, the prosecutor commented that "[t]here's no flaw in the state's case." In the seventh instance, the prosecutor referred to Lininger in a negative manner. In the eighth instance, Lininger alleges that the prosecutor commented on Lininger's decision not to testify at trial. We found no such comment in the record. Finally Lininger asserts that the prosecutor commented on Wheeler being "conscientious" about not "point[ing] the finger at somebody."
 {¶ 72} We are of the opinion that these nine instances of alleged prosecutorial misconduct are either based on a misreading of the trial transcript or fall within the "degree of latitude" granted to prosecutors. In either case, Lininger failed to show that but for the alleged instance of prosecutorial misconduct, Lininger would not have been convicted. We find no plain error in any of the instances stated above.
 {¶ 73} Lininger also contends that the prosecutor committed prosecutorial misconduct by referring to and pointing at a victim, who was present in the courtroom during the closing arguments. While such references may have occurred during the closing arguments, it is the duty of the attorney to make such non-verbal references noted in the record. The record contains no evidence regarding the alleged non-verbal references. As this court can only rule based on the trial transcript before it, this allegation of prosecutorial misconduct is without basis.
 {¶ 74} In reviewing all of Lininger's allegations of prosecutorial misconduct and assessing whether he was substantially prejudiced by these instances, this court finds no reversible error. Lininger's fourth assignment of error is not well-taken.
 {¶ 75} In his fifth assignment of error Lininger asserts that he was prejudiced by the manner in which he was forced to display his teeth to the jury.
 {¶ 76} During the trial, the judge asked Lininger to display his teeth to the jury, because there was an "identification question." While Lininger displayed his teeth, the prosecutor made some comments asking Lininger to show the jury more of his teeth.
 {¶ 77} The court in U.S. v. Curtis (C.A.10, 2003),344 F.3d 1057, 1063, found that the "[d]efendant's displaying of his teeth simply allowed the jury to make its own comparison between the description given by the two witnesses and Defendant's actual appearance. We find nothing unduly suggestive about that procedure and conclude that it did not violate Defendant's due process rights."
 {¶ 78} The United States Supreme Court has also noted inHolt v. United States (1910), 218 U.S. 245, 252-253, that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material."
 {¶ 79} In the case at bar, the description of Lininger's teeth was a material part of Kaminski's and Wheeler's description of Lininger. In United States v. Curtis, the court held that this was constitutionally permissible. The trial court did not violate Lininger's Fifth Amendment due process rights by compelling Lininger to display his teeth to the jury. Lininger's fifth assignment of error is not well-taken.
 {¶ 80} In his sixth assignment of error Lininger contends that the trial court erred in imposing upon him consecutive, non-minimum sentences.
 {¶ 81} Upon review, we find that this issue is controlled by the Supreme Court of Ohio's decision in State v. Foster,109 Ohio St.3d 1, 2006-Ohio-856. In Foster, the court held that R.C. 2929.14(E)(4) and 2929.21(A), the statutory sections under which courts impose consecutive sentences, violate theSixth Amendment to the United States Constitution, pursuant to Blakelyv. Washington (2004), 542 U.S. 296, and Apprendi v. New Jersey
(2000), 530 U.S. 466. Because the trial court relied on an unconstitutional statute when sentencing appellant, we find that the sentences are void and must be vacated. Foster, supra at ¶ 103-104. Lininger's sixth assignment of error is therefore well-taken.
 {¶ 82} On consideration whereof, the judgment of the Lucas County Court of Common Pleas is affirmed in part and reversed in part. The sentence is hereby vacated and the case is remanded to the trial court for resentencing in accordance with this decision. The parties are ordered to pay equally the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Handwork, J., Pietrykowski, J., Parish, J., concur.