**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 5, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

LESLIE SCHOBE THOMPSON, also
known as Grasshopper,

      Defendant - Appellant.

No. 07-5103

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 07-CR-008-001-CVE)**

Leena Alam, Assistant United States Attorney (David E. O'Meilia, United States
Attorney, Northern District of Oklahoma, on the brief), Tulsa, Oklahoma, for
Plaintiff - Appellee.

Fred Lynn, Tulsa, Oklahoma, for Defendant - Appellant.

Before **KELLY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

**KELLY**, Circuit Judge.

      Defendant-Appellant Leslie Schobe Thompson was convicted by a jury of

three counts of armed bank robbery in violation of 18 U.S.C. § 2113(a), (d)

(counts 1, 3, 5), three counts of use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (counts 2, 4, 6), and one count of possession of a firearm after conviction of a felony in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), (e) (count 7). Mr. Thompson was sentenced to life in prison on counts 1 through 6, 235 months' imprisonment on count 7, and 5 years' supervised release. The sentences for counts 1, 3, 5, and 7 are to run concurrently; the sentences for counts 2, 4, and 6 are to run consecutively to each other and to any other term of imprisonment. On appeal, Mr. Thompson challenges his convictions, claiming his Fourth Amendment, Speedy Trial Act, and due process rights were violated in connection with his arrest and prosecution. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

Background

On December 9, 2006, the Tulsa Police Department received a telephone call from a woman indicating that the person who robbed BancFirst in Tulsa on December 8 was a black male known as "Grasshopper" and was at her mother's house located at 4686 North Main Street. She informed the police that she had seen Grasshopper the night before at that residence with a handgun and that she had recognized his picture on television. She also stated that Grasshopper frequently wore dark glasses.

2

Police officers were immediately dispatched to 4686 North Main Street. The dispatch informed the police that Grasshopper was a black male who was approximately 5 feet, 6 inches tall and weighed 185 pounds. The dispatch did not indicate the existence of any emergency or exigent circumstance. Officers Meadors and Bowman arrived at 4686 North Main Street minutes later, without a search warrant or arrest warrant. Corporal Blair arrived shortly thereafter with a surveillance photograph of the suspect. Additional officers took positions around the house.

Officers Meadors and Bowman and Corporal Blair approached the front door and Officer Meadors knocked. Officer Meadors could hear the lock open and people moving around inside but it took a few minutes for anyone to open the door, which he found suspicious. Dianne Snell ultimately answered the door. Ms. Snell told Officer Meadors her name, acknowledged that the house was hers, and allowed the officers to enter. Officer Meadors informed Ms. Snell that he was looking for somebody named Grasshopper because he was a suspect in an armed bank robbery and asked her if Grasshopper was in the house. Ms. Snell indicated that he had been there earlier but that she was not certain whether he was still there. Officer Meadors asked for permission to search the house for Grasshopper and Ms. Snell granted permission for him to do so, placing no limitations on the search.

3

Officer Meadors entered the southwest bedroom of the residence and saw a man who did not match the picture of the suspect. Officer Meadors handcuffed him and placed him in the living room. Other officers found another man in the southeast bedroom, handcuffed him, and placed him in the living room as well.

After the officers searched the first two bedrooms without finding Grasshopper, Officer Meadors approached the northwest bedroom, the door to which was closed but not locked. While outside that bedroom, Officer Meadors again asked Ms. Snell where Grasshopper was. She told him that if Grasshopper were in the house, he would likely be in the northwest bedroom. Ms. Snell never told Officer Meadors anything about whether Grasshopper was a boarder, and at the time of the search, Officer Meadors did not know that Grasshopper was renting the bedroom. Officer Meadors opened the door and entered the bedroom. He saw no one in the room and proceeded to open the closet door. Inside, he saw that someone was hiding in the closet because he saw a person's foot. He then ordered, at gunpoint, the person to exit the closet. The man who exited the closet identified himself as Leslie Thompson.

According to Officer Meadors, Mr. Thompson exactly matched the surveillance photo brought by Corporal Blair. Officer Meadors placed Mr. Thompson under arrest, handcuffed him, searched him for weapons, and escorted him to the dining room. Once Mr. Thompson saw the other men in handcuffs, he asked Officer Meadors why they had been handcuffed. Officer Meadors

4

explained that the police did not know who was involved in the robbery. Mr. Thompson then told Officer Meadors that no one else was involved.

Officer Meadors then asked Mr. Thomspon for permission to search the northwest bedroom. Mr. Thompson did not have his eyeglasses so Officer Meadors read a "search waiver"[1] to him. Mr. Thompson then signed the waiver in Officer Meadors' presence. A few minutes earlier (but after the officers had apprehended Mr. Thompson), Ms. Snell had signed a nearly identical waiver giving the police permission to search the entire house. In the northwest bedroom where Mr. Thompson had been hiding, officers found a loaded black pistol, dark sunglasses and a black hooded sweatshirt.

About twenty minutes after he signed the search waiver, Mr. Thompson signed a Tulsa Police Rights Waiver form waiving his Miranda rights. Later, Detective Stephen St. Clair arrived at the scene and asked Ms. Snell about Mr. Thompson's relationship to the house. She told him that Mr. Thompson had been living at her home for the past month and had paid her $100 rent for the northwest bedroom. However, she later stated that the room was not exclusively Mr. Thompson's, as anyone could go in and out of the room and the door to the room did not have a lock on it.

---

[1] The "search waiver" recites that the defendant has been informed of the right to have a search conducted with a warrant and the right to refuse consent to search, and authorizes the police to search. I. R. Doc. 37, Ex. E.

After being arrested, Mr. Thompson was transported to the Robbery Division Office, where he was re-read his Miranda rights from the waiver form he had earlier signed. Mr. Thompson agreed to make a statement and admitted to committing multiple armed bank robberies.

The grand jury returned the seven-count indictment on January 12, 2007. Mr. Thompson subsequently filed a motion to dismiss the indictment on the basis of a Speedy Trial Act violation. He argued that because he was arrested on December 9, 2006, the time between his arrest and indictment spanned 34 calendar days, exceeding the 30-day period provided in 18 U.S.C. § 3161(b). The district court denied the motion, concluding that the 30-day period expired on January 13, 2007. The court found that since the federal arrest warrant was issued on December 11, Mr. Thompson was taken into federal custody as of that date. The court also noted that when Mr. Thompson was arrested on December 9, even though no federal arrest warrant had been issued, there was a Kansas state arrest warrant outstanding for him and thus he would have been detained on that state warrant even if federal charges had not been forthcoming. Then, relying on 18 U.S.C. § 3161(h)(1)(F), the court excluded December 12, 13, and 14 from the 30-day period because the government had made an oral motion for detention on December 11 that was not resolved until December 14. The court alternatively held that even if Mr. Thompson had been placed in federal custody on December

6

9, the indictment would be still be timely under 18 U.S.C. § 3161(b) since there was no grand jury in session between December 5, 2006 and January 9, 2007.

Mr. Thompson also filed a motion to suppress, arguing his arrest and the subsequent search of his room violated the Fourth Amendment. He also argued that the incriminating statements he made at the time of the seizure and later at the police station were the fruit of the unlawful search and seizure. After a suppression hearing, the court denied that motion as well. The court found that Ms. Snell had actual and apparent authority to consent to the search and held that she voluntarily consented to the search of her house. The court also found that Ms. Snell had actual authority to consent to the search of the northwest bedroom based upon the fact that she and others were free to go in and out of that bedroom. In the alternative, the court found that the officers reasonably believed that Ms. Snell had authority to consent to their entry of the northwest bedroom because the officers did not learn that Mr. Thompson had paid rent for that bedroom until after they had entered the room and taken Mr. Thompson into custody.

Once the district court found the initial search and seizure was constitutional, it determined that the subsequent search of Mr. Thompson's room did not violate the Fourth Amendment because Mr. Thompson voluntarily signed the search waiver, even though he was under arrest when he gave his consent. For the same reason, the court found that Mr. Thompson's incriminating

7

statements should not be excluded because they were not tainted by any prior illegal conduct. In addition, the court found that the statements Mr. Thompson made before he was read his <u>Miranda</u> rights were admissible because he volunteered them; they were not made in response to police interrogation.

Finally, in a pre-trial conference, the government notified the district court that it intended to have Mr. Thompson wear the hooded sweatshirt and sunglasses recovered from the northwest bedroom at trial. The government sought to have Mr. Thompson don the hooded sweatshirt and glasses because it planned to show the jury videotapes of the charged robberies in which the perpetrator wears sunglasses and a hooded sweatshirt. Mr. Thompson objected and argued that the procedure would be impermissibly suggestive and would violate his due process rights. The court issued an order requiring Mr. Thompson to wear the hooded sweatshirt and glasses, concluding that doing so would not violate his Fifth Amendment right against self-incrimination or his due process rights. During Mr. Thompson's trial, at the government's request, the court ordered Mr. Thompson to wear the sunglasses in front of the jury. Mr. Thompson was not ordered to wear the sweatshirt.

On appeal, Mr. Thompson challenges each of the district court's three rulings, which we now address in turn.

Discussion

I.

We review the district court's denial of a motion to dismiss for violation of the Speedy Trial Act for an abuse of discretion and review de novo the district court's compliance with the Act's legal requirements. See United States v. Abdush-Shakur, 465 F.3d 458, 461 (10th Cir. 2006). We accept the district court's factual findings unless they are clearly erroneous and, if the district court properly considers the statutory factors without making clearly erroneous factual findings, the "district court's judgment of how opposing considerations balance should not lightly be disturbed." Id. (quotation omitted).

The Speedy Trial Act is designed to protect a criminal defendant's constitutional right to a speedy trial and serve the public interest in bringing prompt criminal proceedings. United States v. Apperson, 441 F.3d 1162, 1177-78 (10th Cir. 2006). As part of that protection, it requires that an "indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). On appeal, Mr. Thompson argues that because he was arrested on December 9, 2006 and not indicted until 34 days later on January 12, 2007, the indictment should have been dismissed. However, the district court found that there was no grand jury in session in the Northern District of Oklahoma between December 5, 2007 and

9

January 9, 2007 and Mr. Thompson does not challenge this finding. Therefore, because there was no grand jury in session when the time to file the indictment would have otherwise expired, the period for filing the indictment extended an additional 30 days. See id. ("If an individual has been charged with a felony in a district in which no grand jury has been in session during such thirty-day period, the period of time for filing of the indictment shall be extended an additional thirty days."). The indictment was filed well within that additional 30-day period and thus was timely.[2]

## II.

In reviewing the denial of a motion to suppress, we accept the district court's factual findings unless they are clearly erroneous and we view the evidence in the light most favorable to the government. United States v. Worthon, — F.3d —, Nos. 07-3122, 07-3123, 2008 WL 852798, *4 (10th Cir. Apr. 1, 2008). However, we review de novo the ultimate determination of reasonableness under the Fourth Amendment. Id. "The credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." Id.

---

[2] The district court alternatively held that the indictment was timely because Mr. Thompson was taken into federal custody on December 11 and the 30-day period, after excluding three days due to a pending detention motion filed by the government, expired on January 13, 2007. Because we resolve this issue as above, we need not consider this additional ground.

10

The Fourth Amendment protects "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (quoting United States v. U.S. District Court, 407 U.S. 297, 313 (1972)). The principal protection against unnecessary intrusions into the home by police is the Fourth Amendment's warrant requirement. Id. Thus, warrantless searches and seizures inside the home are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 586 (1980). This protection extends to rented premises. See Chapman v. United States, 365 U.S. 610, 616-17 (1961).

However, the "Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." Georgia v. Randolph, 547 U.S. 103, 106 (2006) (citing Illinois v. Rodriguez, 497 U.S. 177 (1990); United States v. Matlock, 415 U.S. 164 (1974)). In other words, a third party who voluntarily consents to the search of commonly held property must have actual or apparent authority to do so. See Rodriguez, 497 U.S. at 188.

Actual authority, which the government must prove by a preponderance of the evidence, United States v. McAlpine, 919 F.2d 1461, 1463 (10th Cir. 1990),

11

rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Matlock, 415 U.S. at 171 n.7. In United States v. Rith, we clarified that actual authority requires "either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." 164 F.3d 1323, 1329 (10th Cir. 1999). Apparent authority exists when officers reasonably, even if erroneously, believe that the person consenting to the search has the authority to do so. See Rodriguez, 497 U.S. at 186, 188-89. We review the validity of consent to search de novo. See United States v. Andrus, 483 F.3d 711, 716, on reh'g, 499 F.3d 1162 (10th Cir. 2007).

In addition, the Fourth Amendment requires that consent be voluntary and "not be coerced, by explicit or implicit means, by implied threat or covert force." Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973). Voluntariness is a factual finding that is determined under the totality of the circumstances. Id. at 227. Thus, we review the district court's determination of voluntariness for clear error. See United States v. Davis, 197 F.3d 1048, 1050 (10th Cir. 1999).

On appeal, Mr. Thompson argues that (1) Ms. Snell did not have actual or apparent authority to consent to the search of the northwest bedroom because he was a boarder in her home; (2) she did not consent to any search until she

12

executed the search waiver, after he was arrested; (3) her consent was not voluntary; and (4) his incriminating statements and execution of the search waiver were tainted by the above resulting in his unlawful arrest. We address each argument in turn and find that each is without merit.

As an initial matter, there is no serious dispute that Ms. Snell had actual authority to consent to the search of the common areas of the residence, as she owned the residence and lived there. Our inquiry thus focuses on whether she had actual authority to consent to the search of the northwest bedroom and whether she in fact voluntarily did so before the police entered that room. Mr. Thompson argues that Ms. Snell had no authority to consent to the search of the northwest bedroom because Mr. Thompson had rented that room from her for $100. To be sure, the Fourth Amendment does not permit a landlord to consent to the search of an area leased exclusively to a tenant. Chapman, 365 U.S. at 616-17. But here, the facts the district court credited support the conclusion that Mr. Thompson did not have exclusive use of, or control over, the northwest bedroom. Detective St. Clair testified that Ms. Snell told him that the northwest bedroom was not exclusively Mr. Thompson's room, rather "[i]t was a room she was allowing him to stay in until he got situated." See IV. R. at 41. She also told Detective St. Clair that the door to the bedroom did not lock and that she and others were free to go in and out of that bedroom. Id. Accordingly, Ms. Snell had "mutual use of the [northwest bedroom] by virtue of joint access" to it, Rith,

13

164 F.3d at 1329, and Mr. Thompson assumed the risk that Ms. Snell might permit it to be searched, see Matlock, 415 U.S. at 171 n.7. Therefore, Ms. Snell had actual authority to consent to the search.[3]

Further, Ms. Snell consented to the search before she executed the search waiver and before Officer Meadors entered the northwest bedroom and arrested Mr. Thompson. After Ms. Snell allowed the officers to enter the residence, the officers told her they were there looking for Grasshopper. She told them that Grasshopper had been there but that she was not sure if he was there at that moment. Officer Meadors then specifically asked for her permission to search the home for Grasshopper. She granted permission and placed no limitations on where the officers could search. See IV. R. at 16-17. When the officers did not find Mr. Thompson after searching two bedrooms, Officer Meadors again asked Ms. Snell where Grasshopper was. She specifically told Officer Meadors that if Grasshopper were in the house, he would be in the northwest bedroom. Id. at 34. Thus, she clearly consented to the search before Officer Meadors entered the northwest bedroom.

We also find that nothing in the record indicates that Ms. Snell's consent was involuntary. Mr. Thompson argues that Ms. Snell's consent was coerced given the number of officers present, the fact that the search request was made in

_____

[3] Because we have concluded that Ms. Snell had actual authority to consent to the search, we need not address whether she had apparent authority to do so.

14

the home, that the officers indicated that they were there to arrest Grasshopper, and that they did not tell her she could refuse. First, the record demonstrates that when Officer Meadors requested permission to search for Grasshopper, Ms. Snell was approached by three police officers. In general, "the presence of more than one officer increases the coerciveness of an encounter," but that alone does not render consent per se involuntary. United States v. Iribe, 11 F.3d 1553, 1557 (10th Cir. 1993) (internal quotation omitted) (finding that presence of five officers did not by itself render consent involuntary). Second, the fact that the police made their request inside Ms. Snell's home is of little moment as Ms. Snell voluntarily allowed the police to enter after they knocked on the door. Third, we reject Mr. Thompson's argument that Ms. Snell was coerced into consenting because the police indicated they were there to arrest Grasshopper. Nothing in the record demonstrates that the police indicated that they were there to arrest or question Ms. Snell, that they threatened or coerced her in any way, or that she was otherwise suspected of being involved in the bank robberies.[4] Finally, we reject Mr. Thompson's argument that Ms. Snell's consent was not voluntary because the police did not inform her of her right to refuse consent, as it is well

---

[4] We also note that Mr. Thompson's reliance on Bumper v. North Carolina for the proposition that Ms. Snell's acquiescence to the search was nothing "more than acquiescence to a claim of lawful authority" is misplaced. 391 U.S. 543, 549 (1968). Bumper held that there can be no lawful consent when "that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant." Id. at 548. No officer made any such assertion here.

15

established that "knowledge of the right to refuse consent" is not "a necessary prerequisite to demonstrating a 'voluntary' consent." Schneckloth, 412 U.S. at 232-33. Rather, we need only look for evidence that her consent was coerced, and here we find none.

Because we have found no constitutional violation in connection with the events leading up to the arrest of Mr. Thompson, there is no predicate violation to invoke the derivative evidence doctrine. We therefore reject Mr. Thompson's argument that his consent to search and incriminating statements were the fruit of a poisonous tree. See Davis, 197 F.3d at 1052; United States v. Lewis, 24 F.3d 79, 82 (10th Cir. 1994).

## III.

Mr. Thompson's final challenge is that the in-court identification procedure that took place in front of the jury was unconstitutionally suggestive and thus violated his due process rights. As an initial matter, we note that although Mr. Thompson takes issue with the district court's pre-trial order requiring him to wear in front of the jury the black hooded sweatshirt and sunglasses found in the northwest bedroom, at trial the court ordered him to wear only the sunglasses. The prosecution requested this identification procedure so that the jury could compare the defendant wearing the sunglasses to videotapes obtained from the robberies that showed the perpetrator wearing sunglasses.

16

"We review de novo the constitutionality of identification procedures, but we review for clear error the factual basis for the district court's decision." United States v. Curtis, 344 F.3d 1057, 1062 (10th Cir. 2003). "We examine whether the in-court identification procedure was so suggestive that it denied defendant due process of law. We recognize that if there is a very substantial likelihood of irreparable misidentification under an in-court identification procedure, the district court should take the eyewitness credibility issue from the jury." Id. at 1062-63 (quotation and brackets omitted). Accordingly, when suggestive identification procedures are used at trial, "reliability is the linchpin for determining admissibility. Even an identification at trial under circumstances that are tantamount to a showup is not per se inadmissible, but rather depends upon the totality of the circumstances." Id. at 1064.

In arguing that the in-court identification procedure used here was unconstitutionally suggestive, Mr. Thompson primarily relies on authorities concerning pre-trial identification procedures. However, the identification that took place here was in court and by the jury. Therefore, the authorities relied upon by Mr. Thompson are not controlling. Rather, in conducting our review, we rely on our decisions in Curtis, 344 F.3d 1057, and United States v. Robertson, 19 F.3d 1318 (10th Cir. 1994), both of which involved in-court identifications by the jury. The distinction between pre-trial and in-court identifications is not

17

unimportant. Although "there can be little doubt that the initial in-court identification is suggestive," we have previously observed that "[w]hen the initial identification is in court, there are different considerations. The jury can observe the witness during the identification process and is able to evaluate the reliability of the initial identification." Robertson, 19 F.3d at 1323 (quotation omitted).

In Curtis, we concluded that the district court's order that required the defendant to show his gapped teeth to the jury was reasonable in light of the corroborative testimony by two of the victims that the perpetrator had gapped teeth. 344 F.3d at 1063. The district court allowed the in-court identification procedure only after the testimony of the two corroborating witnesses and gave a cautionary instruction to the jury. See id. We found nothing unduly suggestive about this procedure because it simply allowed the jury to make its own comparison between the description given by the two corroborating witnesses and the defendant's actual appearance. See id.

Similarly, in Robertson, we upheld the district court's decision to force the defendant to don, in front of an eyewitness and the jury, the cap and dark glasses worn by the bank robber in that case. 19 F.3d at 1322-24. Again, we did not find that procedure to be unduly suggestive or to create a substantial likelihood of misidentification because the district court "included a jury instruction which emphasized that the jury should carefully scrutinize an in-court identification for

18

its credibility and reliability," and "there was substantial other evidence of defendant's guilt presented at trial." Id. at 1323.

In light of our precedent, we conclude that the in-court identification procedure used in the instant case was not unconstitutionally suggestive and did not create a substantial likelihood of misidentification. Like the procedures used in Curtis and Robertson, the procedure used here simply allowed the jury to make its own comparison between the appearance of the perpetrator in the videotapes and the defendant's actual appearance. In addition, the government submitted other evidence showing Mr. Thompson's guilt, including the videotape of his confession. Finally, the district court used its discretion to lessen the suggestiveness of the procedure. For example, the court allowed Mr. Thompson to use an in-court line-up or show the jury pictures of other black men of similar stature donning the same apparel. Mr. Thompson speculates that it was unrealistic to find other men of similar appearance willing to participate in such a procedure so close to trial, but he offers no evidence that he even attempted to do so. The court also gave a cautionary instruction to the jury.[5] Thus, in light of the

---

[5] The instruction stated:

The government must prove, beyond a reasonable doubt, that the offenses charged in this case were actually committed and that it was defendant who committed them. Thus, the identification of defendant as the person who committed the offenses charged is a necessary and important part of the government's case.

(continued...)

19

evidence of Mr. Thompson's guilt and the court's efforts to lessen the suggestiveness of the in-court identification procedure, we find that the procedure used was not unduly suggestive and did not violate Mr. Thompson's due process rights.

Mr. Thompson also complains about being the only black person in the courtroom during the trial. Although we recognize that it is suggestive to identify Mr. Thompson as the robber when the robber was a black man and Mr. Thompson was the only black man in the courtroom, it is not unconstitutionally suggestive. See Curtis, 344 F.3d at 1063; see also United States v. Davis, 103 F.3d 660, 670 (8th Cir. 1996); Romero v. Tansy, 46 F.3d 1024, 1031-32 (10th Cir. 1995). Further, although the district court offered Mr. Thompson the opportunity to use

[5](...continued)
> Mr. Thompson was asked to appear before you wearing sunglasses. You are instructed that the fact that defendant donned such apparel in court is not evidence that defendant has committed any of the charged crimes. The sole purpose of requiring defendant to appear before you wearing sunglasses was for identification purposes.
>
> You are instructed that, during your deliberations, you are to examine all of the evidence in this case, including but not limited to identification evidence. If, after examining all of the testimony and evidence in this case, you have a reasonable doubt as to the identity of defendant as the person who committed any of the offenses charged, you must find the defendant not guilty of that offense or offenses.

I. R. Doc. 104 at 17-18.

an in-court line-up or photos to lessen the suggestiveness of the in-court identification, he was not constitutionally entitled to such methods and, in any event, did not take advantage of them.  See Curtis, 344 F.3d at 1063-64 (citing United States v. Domina, 784 F.2d 1361, 1369 (9th Cir. 1986)).  Thus, the fact that Mr. Thompson was the only black man in the courtroom does not change our conclusion that, under the totality of the circumstances and in light of the evidence of Mr. Thompson's guilt, which included his confession, the identification procedure was sufficiently reliable and not unconstitutionally suggestive.

AFFIRMED.