FILED
United States Court of Appeals
Tenth Circuit

October 13, 2020

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JUAN CARLOS QUEZADA-LARA,

    Defendant - Appellant.

No. 19-2200
(D.C. No. 1:17-CR-01826-MV-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **MURPHY**, Circuit Judges.
_____

Defendant-Appellant Juan Carlos Quezada-Lara appeals the denial of his

motion to suppress. Mr. Quezada-Lara argued before the district court that his

grandfather's consent to search his residence was invalid because (1) it was

involuntary and (2) his grandfather lacked common authority to consent to the

search.[1] After conducting a suppression hearing, the district court rejected Mr.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Mr. Quezada-Lara abandons this common authority argument on appeal.
Although he does note that a search does not violate the Fourth Amendment "where

Quezada-Lara's arguments and denied the motion to suppress. Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

Mr. Quezada-Lara was charged in a two-count indictment: Count 1, assaulting,

resisting, and impeding a federal officer, in violation of 18 U.S.C. § 111, and Count

2, being a prohibited person in possession of a firearm and ammunition, in violation

of 18 U.S.C. §§ 922(g)(3) and (5). ROA, Vol. I at 13. He moved to suppress the

firearms and ammunition found during a search of his residence, contending (1) that

his grandfather did not voluntarily consent to the search and (2) that his grandfather

did not have authority to consent because he lacked common authority over the

premises. *Id.* at 42–59.

At the suppression hearing, FBI Special Agent Bryan Acee testified that the

search of Mr. Quezada-Lara's house occurred late on the night of June 19, 2017 and

in the early morning of June 20, 2017, while law enforcement officers were looking

for Mr. Quezada-Lara in connection with an assault on an officer on June 19th. *Id.*,

Vol. II at 4–6. A few hours after the assault, Mr. Quezada-Lara's girlfriend had

reported his car stolen to the Albuquerque Police Department and provided law

enforcement with his home address. *Id.* at 5. The car was registered to that address.

*Id.*

---

police obtain consent to search from one who possesses common authority over the premises," Aplt. Br. at 25, he does not make any argument regarding his grandfather's lack of common authority.

2

Agent Acee testified that law enforcement surveilled Mr. Quezada-Lara's address and observed a light blue SUV departing the property. *Id.* at 6. Agent Acee recognized the vehicle because he believed it had picked up Mr. Quezada-Lara earlier in the day after he fled from agents. *Id.* Agent Acee pulled the car over, and Mr. Quezada-Lara's girlfriend, Jessica Artega, was in the car. *Id.* at 7. Agent Acee explained to her that law enforcement was looking for Mr. Quezada-Lara, and Ms. Artega responded that she stayed at Mr. Quezada-Lara's home occasionally and that she was "50 percent sure" that Mr. Quezada-Lara was in the house. *Id.* She also stated that Mr. Quezada-Lara had a .45 pistol. *Id.* at 57. She said that she had brought food to the residence for Mr. Quezada-Lara's grandfather that evening and told officers that the grandfather was hard of hearing. *Id.* at 9, 35. Ms. Artega provided Agent Acee with a key to the residence. *Id.* at 9.

Agent Acee testified that Ms. Artega accompanied law enforcement back to the residence, where the agents knocked on the front door and windows and called out to the occupants of the house but received no response. *Id.* at 7–8. Agents went to the back of the house and knocked on the back door. *Id.* at 9. They saw the blinds in a window move and saw Mr. Quezada-Lara's grandfather (Mr. Lara) look out. *Id.* Agent Acee testified that they had awakened Mr. Lara and that he looked "startled." *Id.* Agent Acee stated that when Mr. Lara first opened the window blinds, agents had their weapons drawn but lowered the weapons once they saw Mr. Lara. *Id.* at 12. Agents then identified themselves and asked Mr. Lara to come to the back door. *Id.* at 9–10. Agent Acee summoned Agent Stemo, who is fluent in Spanish, to talk to

3

Mr. Lara. *Id.* at 10. Agent Acee testified that Mr. Lara was cooperative and friendly, and that Mr. Lara appeared to understand what Agent Stemo was telling him. *Id.* at 10–11.

Mr. Lara came out of the house and sat in a chair on the porch. *Id.* at 11. Agent Stemo explained why the police were there and asked if Mr. Quezada-Lara was in the home, and Mr. Lara replied that his grandson had been there earlier in the day for a little while, mentioning that his grandson had taken a shower. *Id.* at 11, 14, 19. He gave agents verbal permission to clear the house to verify whether Mr. Quezada-Lara was there. *Id.* at 12, 72–73. During the initial safety clear, Agent Acee saw drug paraphernalia, including small plastic bags containing residue of what he believed was methamphetamine, on the dresser in the bedroom that Mr. Lara later identified as Mr. Quezada-Lara's. *Id.* at 15.

Agent Stemo testified that she spoke with Mr. Lara on the back porch during the safety clear. Mr. Lara seemed to understand what she was telling him because his answers made sense and indicated that he understood what was being asked. *Id.* at 74. She also stated that Mr. Lara was joking with her. *Id.* at 73–74. Following the safety clear search, Mr. Lara, Agent Stemo, and Agent Acee went into the kitchen and sat at the kitchen table. *Id.* at 12, 75. Mr. Lara carried on a conversation with Agent Stemo, speaking both English and Spanish. *Id.* at 12–13. Mr. Lara stated that he lived at the residence with his daughter and his grandson. *Id.* at 76. Agent Stemo explained to Mr. Lara that agents were there because they believed his grandson had been involved in an incident where he ran over one of their task force officers. *Id.* at

4

78. She testified that she thought she told him agents were looking for drugs or firearms, and that he responded that he did not have any guns because his daughter did not like them. *Id.* at 78–79. Mr. Lara told the agents that his grandson's bedroom was located by the back door and showed Agent Acee the bedroom. *Id.* at 14. Mr. Lara also told the agents that his grandson sometimes slept in a shed in the backyard. *Id.* at 14–15.

Agent Stemo presented Mr. Lara with a Spanish language consent-to-search form and went over it with him. *Id.* at 15. When asked if he had any questions about the form, he stated that he did not. *Id.* at 79. Agent Stemo testified that when she was reading the form to him, Mr. Lara appeared to understand it, was nodding his head, and never hesitated before signing the form. *Id.* at 79–80. Mr. Lara then signed the consent form, and the agents conducted a full search of the residence. *Id.* at 17–19. Agent Stemo sat in the kitchen with Mr. Lara for 30 to 45 minutes during the search of the home. *Id.* at 80. They discussed who lived there, and Mr. Lara told agents that his daughter had gone to Mexico. *Id.* at 94. According to Agent Stemo, Mr. Lara appeared to have his wits about him, never indicated that he was suffering from some type of dementia, and never responded to her questions with, "I don't remember." *Id.* at 81. During the search, agents found some of Mr. Quezada-Lara's clothing in the bathroom. *Id.* at 19. Agents also found two guns in the bedroom. *Id.* at 95.

Mr. Lara also testified at the suppression hearing. He could not recall his age or where he lives, why he was in court, or that his grandson was there. *Id.* at 102–04.

He also testified that police had never been to his house. *Id.* at 107. He stated that he did not remember sitting with the police in his kitchen. *Id.* at 108. When asked how old he was, he responded, "I'm really old. I'm like, you know, like 33, 34, I think." *Id.* at 109.

In addition, Mr. Lara's daughter—Rosa Lara Baillon (Ms. Lara)—testified at the suppression hearing. She testified that her father lives at her residence, has his own bedroom, and full access to everywhere in the house. *Id.* at 120. She explained that Mr. Lara has been receiving treatment for Alzheimer's for five years. *Id.* at 114. She testified that she had gone to Mexico to check on her mother on the date that the agents searched her residence. *Id.* at 112. She stated that when she returned home, she found a window of Mr. Lara's room broken. *Id.* at 113. When she asked Mr. Lara what happened, he said, "They tried to kill me." *Id.*

Mr. Quezada-Lara introduced into evidence medical records from Mr. Lara's psychiatrist, who met with Mr. Lara on August 14, 2017 and on February 19, 2018. *Id.*, Vol. I at 50–51. According to the district court, the August 14, 2017 report stated that Mr. Lara suffered from moderate Alzheimer's dementia, describing Mr. Lara as having poor memory, no decisional capacity, and "impoverishment of thinking." *Id.* The February 19, 2018 report stated that Mr. Lara had "advanced" Alzheimer's dementia, as well as impaired memory and limited insight and judgment. *Id.* at 51.

Following the parties' post-hearing briefing, the district court denied Mr. Quezada-Lara's motion to suppress. *Id.* at 41–59. The district court concluded that Mr. Lara had actual authority to consent to the search because his familial

6

relationship with both Mr. Quezada-Lara and Ms. Lara gave rise to a presumption of control for most of the property. *Id.* at 51–54, 58. The district court also found that Mr. Lara voluntarily consented to the search, despite his Alzheimer's dementia, given that at the time of the search, he was lucid and gave coherent answers to the agents' questions. *Id.* at 54–58. The court also found that the agents did not use any coercive tactics to obtain the consent and that the agents' testimony was "straightforward and credible." *Id.* at 57. Mr. Quezada-Lara subsequently entered into a plea agreement, pleading guilty to both counts of the indictment but reserving his right to appeal the denial of his motion to suppress. *Id.* at 60–71. The district court sentenced him to 48 months' imprisonment. *Id.* at 72–75. He timely filed a notice of appeal.

## II

In reviewing the denial of a motion to suppress, we accept the district court's factual findings unless they are clearly erroneous, and we view the evidence in the light most favorable to the government. *United States v. Worthon*, 520 F.3d 1173, 1178 (10th Cir. 2008). "The credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." *Id.* However, we review de novo the ultimate determination of reasonableness under the Fourth Amendment. *Id.*

The Fourth Amendment protects "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is axiomatic that the physical entry of the home is the

7

chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quotations omitted). A principal protection against unnecessary intrusions into the home by police is the Fourth Amendment's warrant requirement. *Id.* Thus, warrantless searches and seizures inside the home are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980).

Nonetheless, the "Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). "In other words, a third party who voluntarily consents to the search of commonly held property must have actual or apparent authority to do so." *United States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008).

In addition, the Fourth Amendment requires that consent be voluntary and "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). "The government bears the burden of proving that consent is given freely and voluntarily." *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). Voluntariness is a factual finding that is determined under the totality of the circumstances. *Bustamonte*, 412 U.S. at 226. Thus, we review the district court's determination of voluntariness for clear error. *Thompson*, 524 F.3d at 1133. "A district court's factual finding is clearly erroneous when it is without factual support in the record or if, after reviewing all the

8

evidence, we are left with a definite and firm conviction that a mistake has been made." *United States v. Cash*, 733 F.3d 1264, 1273 (10th Cir. 2013) (quotation omitted). That is, as long as the district court's account of the evidence is plausible in light of the record viewed in its entirety, we will not reverse. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985).

## III

Mr. Quezada-Lara makes several new arguments that he did not make before the district court. Mr. Quezada-Lara failed to file a reply brief, even though the government raised the issue of waiver in its response. Aple. Br. at 1, 14, 27.

Mr. Quezada-Lara argues that the backyard of the residence is part of its curtilage and that the agents violated the Fourth Amendment by entering it. Aplt. Br. at 16, 20. He also argues that agents conducted an improper protective sweep, *id.* at 20–23, and that Mr. Lara lacked authority to consent because agents were not told he resided at the home until after he signed a written consent, *id.* at 23. None of these arguments were made before the district court—not in Mr. Quezada-Lara's motion to suppress or in his closing brief. *See* ROA, Vol. I at 15–18 (motion to suppress); *id.* at 33–40 (closing brief).

"An argument not raised in the suppression motion, however, is waived." *United States v. Warwick*, 928 F.3d 939, 944 (10th Cir. 2019) (citing *United States v. Burke*, 633 F.3d 984, 987 (10th Cir. 2011) ("But none of these arguments was presented to the district court at the suppression hearing, and they are therefore waived on appeal.")). "Indeed, we are required under Federal Rule of Criminal

Procedure 12(e) to decline review of any argument not made in a motion to suppress evidence and raised for the first time on appeal, unless good cause can be shown why the argument was not raised below." *Warwick*, 928 F.3d at 944.

It is true that "Rule 12 was amended after our decision in *Burke*. But we recently held the 2014 amendments 'did not change the standard for appellate review, [and] *Burke* remains good law.'" *Id.* at n.2 (quoting *United States v. Bowline*, 917 F.3d 1227, 1236 (10th Cir. 2019)) (alteration in *Warwick*). Under *Burke*, "a suppression argument raised for the first time on appeal is waived (i.e., *completely barred*) absent a showing of good cause for why it was not raised before the trial court." 633 F.3d at 988 (emphasis added). Moreover, *Burke* "applies not only where the defendant failed to file a suppression motion at all in the district court, but also where the motion filed lacked the specific issues raised on appeal." *Id.* at 988–89. Unless good cause is shown, *Bowline* precludes us from engaging in plain error review. 917 F.3d at 1237. But even if Mr. Quezada-Lara could show good cause, he would have to also argue for the application of plain error review. *See United States v. Gonzalez-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005) (noting that the appellant bears the burden of showing plain error). He does not make that argument here.

In addition to failing to show good cause and argue for plain error review, Mr. Quezada-Lara failed to file a reply brief, despite the government raising the issue of waiver in its response. *See, e.g.*, Aple. Br. at 1, 14, 27. Accordingly, these arguments are waived, and "we must decline review." *Warwick*, 928 F.3d at 945; *see Burke*, 633 F.3d at 988 (concluding that the defendant "waived appellate review of

10

[certain] suppression arguments" because he "made no showing of cause in his opening brief, and he failed to do so again in his reply brief despite the government's raising the waiver issue in its response").

## A. Whether consent was voluntary

Mr. Quezada-Lara argues that Mr. Lara's consent was involuntary because of (1) Mr. Lara's dementia and (2) coercive tactics employed by the agents. Aplt. Br. at 24–35. This argument is preserved for our review. Mr. Quezada-Lara challenged the voluntariness of the consent on these grounds before the district court, and the district court ruled on them. *See* ROA, Vol. I at 38 (Mr. Quezada-Lara arguing that the consent was involuntary because of the time of night, number of armed agents, and Mr. Lara's dementia); *id.* at 56–57 (the district court finding that "the record is devoid of evidence that the agents attempted to coerce Mr. Lara or exploit any of his vulnerabilities" and that "[t]he testimony of the FBI agents establishes that at the time of the search, Mr. Lara appeared to be lucid"). Voluntariness is a factual finding determined under the totality of the circumstances, which we review for clear error. *Thompson*, 524 F.3d at 1133.

### 1. Mr. Lara's mental condition.

As in *United States v. Sims*, 428 F.3d 945 (10th Cir. 2005), "the most troubling issue is whether, given [Mr. Lara's] mental condition, his consent was nonetheless the 'product of a rational intellect and a free will' and made with a 'mental awareness so that the act of consent was that of one who knew what he was doing.'" *Id.* at 953 (quoting *United States v. Gay*, 774 F.2d 368, 377 (10th Cir. 1985)). This mental

11

awareness "requires both understanding and judgment." *Id.* But "our cases have never required perfect mental ability to find a consent to search was voluntary." *Id.* In *Gay*, for instance, we concluded that the defendant's argument that consent was involuntary had "no merit" where the defendant was so intoxicated that he "was staggering and swaying as he walked" and slurred his speech, but was able to answer questions and produce his driver's license upon request. 774 F.2d at 375–77.

In determining whether a district court's finding of voluntariness was clearly erroneous, our cases have considered whether the impairment was apparent to the officers, emphasizing that our inquiry regarding impairment focuses on the individual's condition at the time of the search, rather than at a later date. For example, in *Sims*, 428 F.3d at 953, we upheld the district court's finding of voluntariness despite suggestions in the record that the defendant suffered from dementia, "a degenerative disorder that could ultimately affect [the defendant's] judgment." We reasoned that the district court's finding was not clearly erroneous given that the defendant did "not point[ ] this court to any specific evidence of the extent of his impairment at the time of his consent to search," the police testified "that no aspect of [the defendant's] dysfunction was apparent to them," and there was no evidence that the officers "had attempted to exploit any of his vulnerabilities." *Id.*

Mr. Quezada-Lara contends that Mr. Lara's dementia rendered his consent involuntary, and, for support, he relies on (1) the fact that he "had no idea where he was, or what was happening" at the suppression hearing, Aplt. Br. at 31; (2) his daughter's testimony at the suppression hearing that he had dementia for five years,

12

*id.* at 32; and (3) medical records presented to the district court that were created months after the search, *id.*

These arguments fail because, as in *Sims*, the agents here testified that no aspect of Mr. Lara's dysfunction was apparent to them, and the district court credited that testimony. *See* ROA, Vol. I at 57. The agents testified that Mr. Lara was friendly, cooperative, showed no signs of dementia, and seemed to understand what was going on because his answers were responsive to their questions. *See, e.g.*, *id.*, Vol. II at 11, 74. For instance, when asked if he would consent to a search, Mr. Lara nodded affirmatively and signed the consent-to-search form. *Id.* at 79–80. He was also able to explain that he was Mr. Quezada-Lara's grandfather, and that he lived in the home with him. *Id.* at 76. In addition, he knew that his daughter had gone to Mexico*, id.* at 94, and he told the agents that Mr. Quezada-Lara had come to the home earlier that day to take a shower, which agents confirmed when they found some of his clothing in the bathroom, *id.* at 19. Moreover, like in *Sims*, "the district court found no evidence that the police had attempted to exploit any of his vulnerabilities." 428 F.3d at 953; *see* ROA, Vol. I at 57 ("[T]he record is devoid of evidence that the agents attempted to . . . exploit any of his vulnerabilities.").

Mr. Lara's testimony at the March 30, 2018 suppression hearing says nothing about the extent of his impairment at the time of the search, given that the suppression hearing took place more than nine months after the search. The same is true of the medical records introduced. As to his daughter's testimony that Mr. Lara had dementia at the time of the search, the district court found that her testimony

13

suggested that "his dysfunction was limited and perhaps not apparent because he was largely able to care for himself." *Id.* In other words, while her testimony indicated that he had dementia (which was true of the defendant in *Sims*), it also indicated that the "extent of his impairment at the time of his consent to search" was not severe. *Sims*, 428 F.3d at 953. Moreover, Ms. Lara's testimony does not show that the dysfunction was "apparent to [the agents]." *Id.* Indeed, the agents testified that no aspect of the dysfunction was apparent to them, which is consistent with his daughter's testimony suggesting that his dysfunction was limited at the time of the search. And, in any event, "our cases have never required perfect mental ability to find a consent to search was voluntary." *Id.* Considering the evidence in the light most favorable to the government, the district court did not clearly err in finding that Mr. Lara was mentally capable to consent.

### 2. Coercive police tactics alleged

Mr. Quezada-Lara also argues that Mr. Lara's consent was involuntary because of coercive police tactics, stating that the agents: (a) awoke him late at night; (b) pointed rifles at him; (c) allegedly broke his bedroom window; (d) told him to come out to the back porch; (e) yelled into the house for other occupants to come outside; (f) did not ask for consent to accompany him into the residence; (g) did not tell him that they wanted to search for guns and drugs before he signed the consent-to-search form; and (h) did not explain that he had a right to refuse consent to the search. Aplt. Br. at 29–30, 33. He also contends (i) that the number of agents present had a coercive effect. *Id.* at 33. Before the district court, Mr. Quezada-Lara

14

relied only on grounds (a), (h), and (i). *See* ROA, Vol. I at 38 (arguing that consent was involuntary when "[c]oupling his dementia . . . with the time of night . . . and the number of armed agents" and noting that "apparently [Agent Stemo] did not explain to him that he had a right to refuse"). The other arguments are therefore waived.

Again, "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Bustamonte*, 412 U.S. at 227. Regarding coercion, relevant factors "include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, . . . the number of officers on the scene, and the display of police weapons." *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) (citations omitted). The district court found that "the record is devoid of evidence that the agents attempted to coerce Mr. Lara or exploit any of his vulnerabilities." ROA, Vol. I at 57.

We review each of Mr. Quezada-Lara's coercion arguments below, noting which arguments have been preserved and which have been waived. We conclude by analyzing whether the preserved arguments outweigh the numerous factors indicating that Mr. Lara's consent was not coerced.

### (a) Time of day

Mr. Quezada-Lara argues that because the agents came to the residence in the middle of the night, their request that Mr. Lara sign a consent form was coercive. The arrival of police officers at a home in the middle of the night can be more coercive than their arrival during the day, but this factor alone does not show that the

15

consent was involuntary. *See United States v. Abdenbi*, 361 F.3d 1282, 1288, 1292 (10th Cir. 2004) (concluding that "the record is void of any indication that [the third party's consent] was threatened or coerced in any way" even though the third party was contacted at his home "very early in the morning"). Thus, while this factor likely weighs against a conclusion that the consent was voluntary, the district court's ruling was based on a totality of the circumstances.

### (b) Showing of force

As for the argument that the consent was involuntary because the agents pointed rifles at Mr. Lara, Mr. Quezada-Lara never made this argument before the district court. He relied only on the "number of armed agents," ROA, Vol. I at 38, never mentioning the agents pointing their rifles at Mr. Lara. This argument is therefore waived.

### (c) The broken window

Next, without record support, Mr. Quezada-Lara contends that the consent was involuntary because "agents br[oke the] bedroom window." Aplt. Br. at 29. Mr. Quezada-Lara never made this argument before the district court. It is therefore waived. While Mr. Quezada-Lara pointed in his district court briefing to testimony showing that the window had a hole in it, *see* ROA, Vol. I at 35, he never stated who broke the window, or that the agents' purported breaking of the window made the consent involuntary or a product of coercion, *see id.*

16

**(d), (e), (f) Requesting Mr. Lara come to the back porch; yelling for others in the home to come outside; and lack of consent to accompany him into the kitchen**

None of these arguments were raised below. They are therefore waived. Regardless, Agent Acee testified that they moved Mr. Lara to the porch because they thought an exchange of gunfire with Mr. Quezada-Lara was possible, *id.*, Vol. II at 57, and the agents were yelling to find out who else was in the home, *see id.* at 42. As the government points out, these actions had a "valid, non-coercive purpose," so they do not undermine the district court's finding of voluntariness. *Warwick*, 928 F.3d at 946. Moreover, there is no evidence that Mr. Lara later went into the kitchen with agents unwillingly. Agent Stemo asked him if he would go inside, and both of them went to the kitchen. ROA, Vol. II at 75.

**(g) Whether agents told Mr. Lara of the purpose of the search**

Next, Mr. Quezada-Lara argues that the consent was involuntary because agents did not tell Mr. Lara they were searching for guns and drugs. This argument was not raised before the district court, so this argument, too, is waived. In fact, Mr. Quezada-Lara argued the opposite below—that agents "indicated [at the suppression hearing] that they explained [to Mr. Lara] that they wanted to search the house for contraband." *Id.*, Vol. I at 36.

**(h) Right to refuse consent**

Mr. Quezada-Lara next contends that the consent was involuntary because Mr. Lara was not asked if he understood that he had a right to refuse the search. Although Mr. Quezada-Lara raised this argument before the district court, the record

17

indicates that Agent Stemo read the consent-to-search form to Mr. Lara, including its statement, "I've been informed of my right to deny permission to search." *Id.*, Vol. II at 77. After the consent-to-search form was read to Mr. Lara, he signed it. In *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993), we concluded that "the evidence indicates that [the] consent was intelligently given" because the third-party "signed a consent to search form [and t]he form contained a clause discussing the right to refuse consent." The same holds true here. *See also Warwick*, 928 F.3d at 945 ("A signed consent form indicates voluntary consent."). And, in any event, "knowledge of the right to refuse consent" is not "a necessary prerequisite to demonstrating a 'voluntary' consent." *Bustamonte*, 412 U.S. at 232–33.

### (i) The number of agents present

Without stating the specific number of agents present at the time of the search, Mr. Quezada-Lara argues that the number of agents made the consent involuntary. Mr. Quezada-Lara raised this argument before the district court. While the presence of more than one officer increases the coerciveness of an encounter, *Iribe*, 11 F.3d at 1557, "that alone does not render consent per se involuntary." *Thompson*, 524 F.3d at 1134. Although ten to twelve officers were present at the residence here, ROA, Vol. II at 35–36, only three officers were present with Mr. Lara when his consent was requested. *Id.* at 98–99; *see Thompson*, 524 F.3d at 1134 (concluding that consent was voluntary where "the record demonstrate[d] that when [the officer] requested permission to search . . . [the third-party] was approached by three police officers"). Regardless, the number of officers present does not "outweigh[] the numerous factors

18

indicating that [Mr. Lara] voluntarily consented to the search of the house." *Iribe*, 11 F.3d at 1557.

### 3. Factors indicating a lack of coercion

In sum, regarding coercion, we are left with only three arguments preserved for appellate review: the time of day; the number of agents present; and the alleged failure to inform Mr. Lara that he could refuse consent. As for his right to refuse consent, Mr. Lara signed a form containing a clause describing his right to refuse. The number of officers present here and the fact that the search occurred in the middle of the night, however, both tend to make the officers' request to search more coercive than had it occurred during the day with only a single officer. But these factors do not outweigh the numerous factors indicating that Mr. Lara's consent was voluntary and not a product of coercion.

The agents did not engage in coercive tactics such as "physical mistreatment . . . threats, promises, inducements, deception, trickery, or an aggressive tone." *Warwick*, 928 F.3d at 945. The record also "does not reveal that [Mr. Lara] felt coerced, frightened or otherwise threatened" at the time he gave consent to search. *Iribe*, 11 F.3d at 1557. To the contrary, agents testified that Mr. Lara was joking with them, that he was "[c]alm and friendly," even offering to make them food, and there is no evidence that he was handcuffed or restrained. ROA, Vol. II at 21, 73–74, 81, 90–91, 94; *see Warwick*, 928 F.3d at 945 (the fact that the defendant "was friendly and comfortable enough to engage the agents in small talk and jokes" supported finding that he voluntarily consented to a search); *Iribe*, 11 F.3d at 1557

(emphasizing that "[t]he conversation between [the officer] and [the third-party] regarding her consent to search the house was cordial and spoken in low volume"). And, as in *Iribe*, "[n]o promises or threats were made in an attempt to extract [his] consent." 11 F.3d at 1557. Agent Stemo read the consent-to-search form to Mr. Lara in Spanish, including its statement that he had a right to refuse consent, and he signed it without hesitation. Given the numerous factors indicating Mr. Lara's consent was not a product of coercion, the time of day and the number of agents present do not render the district court's finding clearly erroneous.

## B. Whether the search exceeded the scope of the consent

Finally, Mr. Quezada-Lara argues that "the search that took place exceeded the scope of any consent as Mr. Lara was not told agents were searching for drugs and firearms until after his written consent was obtained." Aplt. Br. at 24 (capitalization omitted). This argument was not made before the district court, and he has not attempted to show good cause. Before the district court, Mr. Quezada-Lara did note, in setting forth the general legal standards, that a search cannot exceed the scope of the consent given. *See* ROA, Vol. I at 16. But he never argued that the search exceeded the scope of the consent given by Mr. Lara here. *See id.* at 15–18, 33–40. Thus, the argument has been waived.

20

**IV**

For the foregoing reasons, we AFFIRM the district court's denial of Mr. Quezada-Lara's motion to suppress.

Entered for the Court


Mary Beck Briscoe
Circuit Judge